**DEFENDERS OF WILDLIFE,**
**et al., Plaintiffs,**

**v.**

**Bruce BABBITT, et al., Defendants.**

**Civil Action No. 99–927(ESH).**

United States District Court,
District of Columbia.

Feb. 12, 2001.

Howard M. Crystal, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Mark L. Stermitz, Jane P. Davenport, U.S. Department of Justice, Environment & Natural Resources Div., Martin LaLonde, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs, Defenders of Wildlife and Paul Huddy, bring this suit against defendants in their official capacities as the Secretaries and Directors of the Department of the Interior, Fish and Wildlife Service, Bureau of Land Management, National Park Service, Department of Defense, United States Air Force, United States Navy, United States Army, United States Army National Guard, United States Marine Corps, Department of Justice, Immigration and Naturalization Services, and the United States Border Patrol, alleging failure to comply with the Endangered Species Act of 1973, as amended, ("ESA"), 16 U.S.C. §§ 1531 *et seq.;* the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.;* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, with respect to the survival of the Sonoran pronghorn.

As grounds for their motion for summary judgment, plaintiffs argue (1) that the Biological Assessments ("BA") and Biological Opinions ("BO") prepared by defendants pursuant to the consultation process set forth in Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), are deficient because they fail to analyze the cumulative impacts or effects of other federal agency activities on the survival of the Sonoran pronghorn; (2) that the December 1998 Final Revised Sonoran Pronghorn Recovery Plan ("Plan" or "Recovery Plan") prepared by the Fish and Wildlife Service ("FWS") fails to comply with Section 4(f) of the ESA, 16 U.S.C. § 1533(f), for its failure to set forth required site-specific management actions; objective, measurable criteria; and estimates of the time required to carry out those measures, and to provide for appropriate notice and pub-

lic comment; (3) that the Environmental Impact Statements ("EIS") prepared by defendants do not analyze the cumulative impacts of all agency activities as required by the NEPA; and (4) that defendants are failing to utilize their authority to implement programs for the conservation and recovery of the Sonoran pronghorn, in violation of Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1). Defendants contend that they have complied with the requirements of the ESA and NEPA in their consultations, preparation of the Recovery Plan, and formulations of the EISs, and that they are taking actions to conserve and recover the pronghorn as required by the ESA.

Both plaintiffs and defendants move for summary judgment. For the reasons set forth more fully below, the Court finds that the BOs, the Recovery Plan, and certain EISs do not fully comply with the ESA and NEPA, and therefore grants plaintiffs' motion in part and denies defendants' motion in part. The Court further finds that defendants are taking steps to conserve and recover the pronghorn as required by the ESA, the BAs prepared by the consulting agencies do comply with the ESA, and that certain EISs do comply with NEPA, and therefore grants defendants' motion in part and denies plaintiffs' motion in part.[1]

## BACKGROUND

The Sonoran pronghorn (*Antilocapra americana sonoriensis*), one of five subspecies of pronghorn, evolved in a unique desert environment and have distinct adaptations to this environment which distinguish it from other subspecies. Plan at 1–4. In 1967, the FWS designated the Sonoran subspecies as endangered. 32 Fed. Reg. 4001 (March 11, 1967). While there is uncertainty as to the current population of Sonoran pronghorn in the United States, the most recent estimates range between 120 and 250 pronghorn. Def. St. ¶ 4; Pl. St. ¶ 4. The only habitat in which Sonoran pronghorn currently remain in the United States is federally-owned land in Southwest Arizona. *See* Plan at 8. In Arizona, pronghorn inhabit the Barry M. Goldwater Range ("BMGR" or "Goldwater Range"), the Cabeza Prieta National Wildlife Refuge ("CPNWR" or "Cabeza Prieta NWR"), the Organ Pipe Cactus National Monument ("OPCNM" or "Organ Pipe Cactus NM"), and to a lesser extent, nearby Bureau of Land Management ("BLM") grazing allotments. *Id.* The Goldwater Range is reserved for the use of the United States Air Force ("USAF") and United States Marine Corps ("USMC"), and is also used by the United States Army National Guard ("ARNG"). The CPNWR is administered by FWS and OPCNM is administered by the National Park Service ("NPS"). The Immigration and Naturalization Service ("INS") and United States Border Patrol ("BP") also operate in the area of the pronghorn habitat, primarily along the United States–Mexico border.

Factors threatening the continued survival of the Sonoran subspecies include lack of recruitment (survival of fawns), insufficient forage and/or water, drought coupled with predation, physical manmade barriers to historical habitat, illegal hunting, degradation of habitat from livestock grazing, diminishing size of the Gila and Sonoyta rivers, and human encroachment. Plan at 21. Plaintiffs contend that the various military activities taking place in the pronghorn habitat are contributing significantly to the threat of extinction. Defendants claim that although the military activities "must be monitored and controlled, they do not constitute a survival threat to the Sonoran pronghorn." Def. Mot. at 4. Plaintiffs also contend that INS/BP activities, grazing on BLM lands, and recreational activities in Cabeza Prieta

---

1. Defendants have also moved to strike affidavits submitted by plaintiffs in support of their summary judgment motion as being outside the administrative record and therefore beyond the scope of the Court's review. The Court does not rely on these affidavits in its decision and therefore will deny defendants' motion to strike as moot.

NWR and Organ Pipe Cactus NM are adversely impacting the pronghorn. Defendants argue that these activities do not jeopardize the continued survival of the species.

## STANDARD OF REVIEW

This case is brought pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act, 5 U.S.C. § 706. Under the standards of review set forth in the APA, the Court must review whether the agency actions at issue are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In reviewing the action of the agencies, the Court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), to determine whether the agencies have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action...." *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "In thoroughly reviewing the agency's actions, the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C.1995) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park*, 401 U.S. at 415–16, 91 S.Ct. 814; *Professional Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1220 (D.C.Cir. 1983)). "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record ..., even though the Court does not employ the standard of review set forth in Rule 56, Fed.R.Civ.P." *Id.* (citations omitted).

## I. ENDANGERED SPECIES ACT CLAIMS

### A. Statutory Framework

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In enacting the ESA, Congress recognized that "[f]rom the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations. The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask." *Id.* at 178, 98 S.Ct. 2279 (citing H.R.Rep. No. 93–412, pp. 4–5 (1973)). Its stated purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species ...." 16 U.S.C. § 1531(b).[2] The Supreme Court has noted that "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Id.* at 184, 98 S.Ct. 2279. The Court has also recognized the enactment of the ESA constituted "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species ... [and] reveals a conscious decision by Con-

---

2. One of the primary threats to endangered species and their habitat is that "[m]an and his technology has [sic] continued at any ever-increasing rate to disrupt the natural ecosystem. This has resulted in a dramatic rise in the number and severity of the threats faced by the world's wildlife." *Id.* at 176, 98 S.Ct. 2279 (citation omitted).

gress to give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185, 98 S.Ct. 2279. "All persons, including federal agencies, are specifically instructed not to 'take' endangered species, . . . [and federal] [a]gencies in particular are directed by . . . the Act to 'use . . . all methods and procedures which are necessary' to preserve endangered species." *Id.* at 184–85, 98 S.Ct. 2279 (citations omitted).

Under Section 7 of the ESA, when a federal agency undertakes or permits actions that may affect a listed species, the agency must consult with FWS to "insure" that their activities are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S .C. § 1536(a)(2). Under the formal consultation process, the agency prepares a Biological Assessment ("BA") that evaluates the impact of its activities on the listed species, and the FWS, after evaluation of the BA and "the best scientific and commercial data available," issues a Biological Opinion ("BO") detailing "how the agency action affects the species" and whether the action is "likely to jeopardize the continued existence" of the species. 16 U.S.C. § 1536(a)(2), (b)(3)(A), (c). If the FWS concludes that the activities are not likely to jeopardize the species, it may provide for incidental take of the species. 16 U.S.C. § 1536(b)(4). "Take" is defined to include action that would "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or [ ] attempt to engage in any such conduct." 16 U.S.C. § 1532(19).[3] Pursuant to FWS regulations, "[h]arass in the definition of 'take' in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50

C.F.R. § 17.3. Under Section 4 of the ESA, FWS is also required to develop and implement a recovery plan "for the conservation and survival of" a listed endangered or threatened species. 16 U.S.C. § 1533(f)(1).

B. Section 7(a)(2)—Consideration of Other Agency Activities

Under Section 7 of the ESA, each defendant agency "shall . . . insure that" its activities are "not likely to jeopardize the continued existence" of the Sonoran pronghorn. 16 U.S.C. § 1536(a)(2). Plaintiffs argue that defendants have failed to comply with this mandate because they have not taken into account the cumulative effects of all of the federal activities that affect pronghorn in preparing the BAs and BOs, and therefore, the BAs and BOs have incorrectly concluded that each defendant agency's activities would not jeopardize the continued survival of the pronghorn. Plaintiffs move the Court to remand the BAs and BOs to the defendant agencies for consultation about and consideration of these cumulative effects. Defendants contend that the BAs prepared by the consulting agencies need not evaluate cumulative effects. Defendants also contend that the consideration of "cumulative effects" in the BOs prepared by FWS need not include a discussion of other federal agency activities under the regulations implementing the ESA, but instead they are to be evaluated within the context of the "environmental baseline." Defendants argue that the BO's prepared by FWS have adequately addressed the other federal activities in the "action area" that constitute the "environmental baseline." Plaintiffs respond by arguing that defendants have, in certain cases, used an overly narrow definition of the action area of a particular agency's activities so as to exclude consideration of other federal activities, and that while some of the BO's list or acknowledge other federal activities affecting pronghorn, none

3. Under the ESA the "take" of an endangered or threatened animal is prohibited, unless authorized by the ESA or by an incidental take statement. 16 U.S.C. § 1538(a)(1).

of the BO's provides an *analysis* of the impacts of all the federal activities on the species or analyzes the proposed actions in the context of that aggregate impact.

 Contrary to defendant's argument, the Court is persuaded, as explained more fully below, that FWS must analyze the effects of the action in conjunction with the effects of other agencies' actions on the pronghorn, and that this has not been adequately done with respect to the BOs at issue here. The purpose of Section 7(a)(2)'s consultation requirement is to insure that an agency's activities do not jeopardize endangered species such as the pronghorn. For this reason, applicable regulations require an agency to analyze the effects of its activities when added to the past and present impacts of all federal activities in the action area on an endangered species, as well as certain anticipated actions that have already undergone formal or early consultation. An agency cannot fulfill this duty by simply listing the relevant activities or by narrowly defining the action area to exclude federal activities that are impacting the pronghorn. By limiting their analysis in such a manner, defendants avoid their statutory duty under the ESA to insure that their activities do not jeopardize the existence of the pronghorn. Therefore, the Court will grant summary judgment to plaintiffs on their Section 7(a)(2) claims relating to the BOs prepared by FWS in consultation with defendants, and remand those BOs for further consideration consistent with the regulations and the Court's opinion.[4]

## 1. Environmental Baseline

The applicable regulations mandate that FWS address the following pursuant to formal consultation:

(1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

(2) Evaluate the current status of the listed species or critical habitat.

(3) *Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.*

(4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.14(g) (emphasis added).[5]

The " '[e]ffects of the action' refers to the *direct and indirect effects of an action on the species* or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, *that will be added to the environmental baseline.*" 50 C.F.R. § 402.02 (emphasis added).[6] In turn, "[t]he envi-

---

4. By contrast, the Court finds that the consulting agencies do not have the duty to evaluate the cumulative effects in the BAs they prepare. Under 50 C.F.R. § 402.12(f), "[t]he contents of a biological assessment are at the discretion of the Federal agency and will depend on the nature of the Federal action." The regulation further provides that "[t]he following *may be considered* for inclusion: ... [a]n analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies." *Id.* (emphasis added). The Court therefore will grant summary judgment in favor of the consulting agency defendants with respect to the BAs.

5. Under the ESA, " '[c]umulative effects' are those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02 (emphasis added). Therefore, defendants are correct that an analysis of "cumulative effects," as defined by the regulations, need not incorporate an analysis of the effects of other federal agency activities on the pronghorn.

6. "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consider-

ronmental baseline includes *the past and present impacts* of all *Federal,* State, or private actions and other human activities in the action area, *the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation,* and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.* (emphasis added). It is therefore in the analysis of the environmental baseline that other federal activities in the action area that impact pronghorn must be taken into account by FWS. In turn, the analysis of the effects of the action must address these effects in conjunction with the impacts that constitute the baseline. In addition, the Secretary is required, if an incidental take is authorized, to specify in its opinion the impact of such incidental taking on the species. 16 U.S.C. § 1536(b)(4). The impact of an authorized incidental take cannot be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other incidental take authorized by FWS. As illustrated below, the BOs prepared with respect to the activities of defendants do not contain this required analysis. Therefore, the Court will remand the BOs to the FWS to complete an analysis of the environmental baseline in each opinion and the effects of the action when

added to that baseline.[7] Such analysis should also address any take authorized with respect to the pronghorn, as an anticipated future impact.

For example, the September 5, 2000, INS/Border Patrol BO for "United States Border Patrol Activities in the Yuma Sector, Wellton Station, Yuma, Arizona," which is the most recent of the BOs at issue, concludes that agency action is not likely to jeopardize the continued existence of the pronghorn, and anticipates incidental take in the form of harassment that is likely to injure up to one pronghorn every ten years. Attachment to Plaintiffs' Notice of Filing at Summary 1. As required by the regulations, in its discussion of the environmental baseline, the BO sets forth all of· the federal activities in the action area, which is broadly defined, that have past, present, or future anticipated impact on the pronghorn.[8] *Id.* at 15–18. The BO notes activities of CPNWR, BLM, USAF, USMC, and OPCNM, and indicates the amount of take authorized, if any, with respect to each activity. *Id.* at 17–18. The BO also sets forth the anticipated effects of the Border Patrol activities on the pronghorn. *Id.* at 18–21. The BO is deficient, however, in that it does not analyze the effects of the activity in light of the environmental baseline. Simply recit-

ation." *Id.* Plaintiffs do not argue that the activities of the defendants which are the subjects of separate BOs are interrelated or interdependent.

7. In that each incidental take statement relies on its accompanying BO in reaching its no jeopardy conclusion, FWS should also reconsider the incidental take statements in light of the revisions made to the BOs.

8. The BO includes all the federal activities impacting pronghorn which have been the subject of consultation between an agency and FWS. None of the other BOs even contains a comprehensive list of these activities, let alone an analysis of their impacts on the pronghorn or an analysis of the effect of the proposed action when added to those impacts. For example, in the April 17, 1996 USMC BO for "Existing and Proposed Activities by the Marine Corps Air Station–Yuma in

the Arizona Portion of the Yuma Training Range Complex," the discussion of the environmental baseline acknowledges USAF activities in the Goldwater Range, Army National Guard activities in the Goldwater Range, Border Patrol activities in the Goldwater Range and the Cabeza Prieta NWR, recreational use of CPNWR, Organ Pipe Cactus NM, and BLM lands, and livestock grazing. FWS ESA R. 2380–81 (hereinafter cited as "FWS ___"). But a mere listing of activities does not constitute an analysis of the *impacts* of these activities, which is what is required by the regulation defining the baseline. 50 C.F.R. § 402.02 ("[t]he environmental baseline includes the past and present *impacts* of all Federal, State, or private actions ... [and] the anticipated *impacts* ...") (emphasis added). The USAF, BLM and NPS BOs do not even mention certain of the other federal activities that impact pronghorn in the action area.

ing the activities and impacts that constitute the baseline and then separately addressing only the impacts of the particular agency action in isolation is not sufficient. *See Greenpeace v. National Marine Fisheries Service,* 80 F.Supp.2d 1137, 1149 (W.D.Wash.2000) ("Although [the BO] states that its conclusions are based on a 'cumulative effects analysis,' and even contains a section titled 'Cumulative Effects,' in fact this section contains no analysis whatsoever and is nothing more than a list .... The section contains no explanation of how the various groundfish fisheries and fishery management measures interrelate and how the overall management regime may or may not affect Steller sea lions.") (citations omitted); *see also Natural Resources Defense Council v. Hodel,* 865 F.2d 288, 298 (D.C.Cir.1988) (under NEPA, finding insufficient "conclusory remarks [and] statements that do not equip a decisionmaker to make an informed decision about alternative courses of action, or a court to review the Secretary's reasoning"). There must be an analysis of the status of the environmental baseline given the listed impacts, not simply a recitation of the activities of the agencies. *See Greenpeace,* 80 F.Supp.2d at 1149. The BO must also include an analysis of the effects of the action on the species when "added to" the environmental baseline—in other words, an analysis of the *total* impact on the species. 50 C.F.R. § 402.02. Moreover, there must be analysis of the impact of the total amount of take authorized, not simply a listing of those numbers. Such a critical analysis is missing from the INS BO, as well as the other BOs at issue here.[9]

### 2. Action Area

The BOs of several of the defendant agencies are also deficient because of their overly narrow definition of action area, which results in the exclusion of certain relevant impacts from the environmental baseline. The environmental baseline includes, *inter alia,* "the past and present impacts of all Federal, State, or private actions and other human activities *in the action area,* [and] the anticipated impacts of all proposed Federal projects *in the action area* that have already undergone formal or early section 7 consultation." 50 C.F.R. § 402.02. The regulations define "action area" as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.* In certain BOs, defendants have defined the action area in a manner inconsistent with this definition.

Defendants attempt to argue that their analysis need not consider other federal activities, since the action area is limited to the federal lands under the control of that agency and/or the immediate area of that agency's action. For example, defendants claim the USMC BO went further than necessary in noting the USAF use of the Gila Bend segment of the BMGR, because USMC "has no direct authority" there. Def. Mot./Opp. at 40. That is not the test of whether an area is part of the action area. If pronghorn there will be directly or indirectly affected by USMC activity, the impacts of other activities there must be included as part of the environmental baseline. *See* 50 C.F.R. § 402.02. Similarly, with respect to the BLM grazing allotments BO, defendants argue that the action area consists solely of the grazing allotment lands, in other words, the immediate area involved. *Id.* at 50.[10] The reg-

---

**9.** NPS has reinitiated consultation with FWS with respect to Organ Pipe Cactus NM. This does not, however, moot the Court's consideration of the existing BO. *Greenpeace,* 80 F.Supp.2d at 1151–52.

**10.** Similarly, defendants argue that the action area at issue in the NPS "Organ Pipe Cactus National Monument General Management" BO consists only of the national monument

area, which is the immediate area, without acknowledging indirect affects on pronghorn outside that immediate area. Def. Mot./Opp. at 55. However, in the section labeled "Effects of the Action," the BO notes the possibility that traffic along State Road 85, which is located in part within the monument, "may act as a barrier to the pronghorn, restricting their movements to east of the highway,"

ulations explicitly reject such a definition of the action area. *See* 50 C.F.R. § 402.02.[11]

The Court cannot accept these overly narrow applications of the definition of an "action area," since they are inconsistent with both the broad purpose of the statute and the definition of "action area" set forth in 50 C.F.R. § 402.02. Pronghorn move across this relatively discreet area of land entirely under federal management without regard to which federal agency is responsible for administering a particular area. Given the unambiguous definition of an "action area," it cannot be narrowly applied so as to avoid taking into account the impacts of other federal activities on the pronghorn. Such an application would undermine the Act's requirement that agencies "insure" that their actions do not jeopardize the continued existence of endangered species.

Such a narrow approach to defining the action area in these three BOs is also inconsistent with the broader the definition of action area correctly applied in the INS and USMC BOs.[12] For example, as discussed above, the INS BO correctly includes *all* federal activities impacting pronghorn in its discussion of the environmental baseline, not just those activities in the immediate area of the Border Patrol activities. Similarly, the USMC BO discussion of the environmental baseline, while it did not specifically define the action area, noted activities in the Goldwater Range and Cabeza Prieta (which overlaps with the Goldwater Range) undertaken by USAF and Border Patrol, grazing on adjacent BLM lands, and recreational activities in Cabeza Prieta, Organ Pipe, and BLM lands.[13] This is consistent with the expan-

FWS 902, which is separate from the present range of most pronghorn, which is west of the highway. Def. Ex. 3. The opinion notes that "[n]ot only is the highway a possible deterrent to expanding pronghorn populations, but the resulting modified behavior patterns may lead to a reduction in genetic exchange, reduced viability, and the ability to adapt to environmental change." FWS 902. Notwithstanding these possible direct and indirect effects from activities in Organ Pipe, including the potential isolation of pronghorn east of SR 85 from the rest of the population, and restriction of the remainder of the population to areas west of SR 85, the BO contains no discussion of past, present, or anticipated future impacts of federal activities in the pronghorn range north and west of Organ Pipe, including BLM grazing lands, the Goldwater Range, and Cabeza Prieta. These lands should be considered part of the action area, as they were by USMC and INS, as the pronghorn there will be indirectly affected by the activities in the immediate area (Organ Pipe) if their range is restricted by such activities. *See* 50 C.F.R. § 402.02.

11. While defendants maintain other federal activities need not legally be included in this limited action area, the BLM BO does mention the USAF and USMC BOs in its discussion of the environmental baseline. FWS 1780. However, there is no analysis of the BLM action in connection with those impacts. Second, defendants' mere reference to other agency activities does not cure the narrow definition of the action area as limited to the

grazing allotments, which the BLM BO applies.

12. Moreover, the defendants' argument on this point is inconsistent. For example, while defendants argue there is no basis to extend an action area to include other agency actions, they nonetheless claim that "FWS takes into account *all federal impacts* through its baseline analysis, even though the particular action may be far more limited in scope." Reply at 11 (emphasis added) (citing the INS BO as an example). By its terms, the environmental baseline includes only federal activities in the action area. Therefore, defendants' argument that other federal activities are not part of the action area but are part of the environmental baseline does not make sense. To the extent that defendants are arguing a BO need not re-analyze a separate federal action, that is not the issue. The environmental baseline must include the *impacts* of that action, not a re-examination of the action in its entirety. While defendants appear to concede such baseline analysis is required, *id.*, as discussed above, they also argue in effect that they need not include these impacts in the environmental baseline given their limited definition of the action area.

13. As discussed above, the USMC BO noted these activities without discussing the *impacts* of the activities. The USMC BO expresses concern about USAF military activities but

sive regulatory definition of action area, as these adjacent areas may be indirectly affected by the military action on the Goldwater Range since all U.S. pronghorn are found in this area. In contrast, the USAF BO, while not specifically defining the action area, considered only USMC activities in the Goldwater Range.[14] The Court finds that the USAF, BLM, and NPS BOs have failed to define the "action area" to include areas where pronghorn may be directly or indirectly affected by the agency action, and in turn to address the impacts that constitute the environmental baseline in that larger area. In contrast, the Court considers that the listing of federal activities contained in the INS BO, which are referenced more generally in the USMC BO, is an appropriate scope of analysis for the environmental baseline under the definition of action area set forth in 50 C.F.R. § 402.02.

The Court therefore remands the USAF, BLM, and NPS BOs for an analysis of the past and present impacts of the additional activities in the action area where pronghorn may be indirectly affected, as well as any anticipated impacts of activities in that area which have begun Section 7 consultation. *See* 50 C.F.R. § 402.02.

### 3. Incidental Take

On remand, FWS must also reconsider its opinions as to the impact of the incidental take authorized by each BO in light of the revisions made to the BOs. *See* 16 U.S.C. § 1536(b)(4). The Court recognizes that the authorization of an incidental take by these BOs does not necessarily mean

that take will occur, or that it will occur at the level anticipated. However, FWS has authorized a total level of take greater than the incidental take provided for in any individual BO without analyzing whether that total level jeopardizes the survival of the pronghorn species. Each incidental take statement simply cites the conclusion of the accompanying BO that the activity at issue is not likely to jeopardize the pronghorn. The population of the Sonoran pronghorn is sparse and its range is relatively limited. While the take of one or two pronghorn as a result of a particular activity may not jeopardize the species as a whole, the aggregate take of pronghorn resulting from each federal activity affecting pronghorn may pose such a risk. As incremental incidental takes are authorized, the impact of those takes on the species must be viewed in the context of previously authorized takes and other impacts that are part of the environmental baseline.

In sum, the BOs do not, contrary to regulatory mandate, adequately analyze the effect of each proposed action when added to the environmental baseline. *See* 50 C.F.R. §§ 402.14(g), 402.02. Nowhere is there a comprehensive discussion, as opposed to a listing, of the impacts that the various federal activities have in the aggregate on the pronghorn. While the Court has reviewed the defendants' actions with deference, defendants' actions do not appear to have been "based on a consideration of the relevant factors." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. *See also State Farm Mutual Ins. Co.*, 463 U.S. at 52, 103 S.Ct. 2856

states that analysis of those would be more appropriately addressed in consultation with Luke Air Force Base. FWS 2402. However, the regulations require that in addressing the effects of the action, FWS must consider the effects when added to the past and present impacts of other federal activities, as well as anticipated future impacts of federal activities which have "already undergone formal or early section 7 consultation." 50 C.F.R. § 402.02. The USMC BO need not undertake comprehensive analysis of those USAF activities which are properly the subject of a separate consultation which was underway at the time the BO was issued, but if particular impacts of those activities are anticipated, they must be incorporated into the environmental baseline. *Id.*

**14.** The ARNG activities on the North–Tac of the Gila Band sector of the Goldwater Range are also addressed in this BO. No BO addressed the ARNG activities on East–Tac because there are no pronghorn there.

(agency must "offer a rational connection between the facts found and the choice made") (citation omitted); *Greenpeace*, 80 F.Supp.2d at 1147 ("A biological opinion is arbitrary and capricious and will be set aside when it has failed to articulate a satisfactory explanation for its conclusions or it has entirely failed to consider an important aspect of the problem.").

Therefore the Court grants summary judgment in favor of plaintiffs on the Section 7(a)(2) claim concerning the BOs and will remand the BOs to the FWS and the consulting agency defendants for further consultation, consideration, and any revisions that may be warranted.[15]

### C. Section 4(f)—Sufficiency of the Recovery Plan

The FWS is responsible for the formulation of a recovery plan pursuant to a delegation of authority from the Secretary under the ESA. *See* 50 C.F.R. § 402.01(b). Under the ESA, FWS is required to develop and implement a recovery plan "for the conservation and survival of" the Sonoran pronghorn. 16 U.S.C. § 1533(f)(1). "Any such [recovery] plan is supposed to be a basic road map to recovery, *i.e.*, the process that stops or reverses the decline of a species and neutralizes threats to its existence." *Fund for Animals*, 903 F.Supp. at

103. Such a plan "shall, to the maximum extent practicable ... incorporate in each plan":

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

16 U.S.C. § 1533(f)(1)(B)(i)-(iii). "[T]he phrase 'to the maximum extent practicable' does not permit an agency unbridled discretion. It imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible." *Fund for Animals*, 903 F.Supp. at 107 (citations omitted). Plaintiffs allege that the "Final Revised Sonoran Pronghorn Recovery Plan" ("the Plan") issued by FWS in December 1998 is deficient in all three respects.[16]

### 1. Site–Specific Management Actions

■ The ESA provides that "in developing and implementing recovery plans," the

---

**15.** The Court declines to hold that given the insufficiency of the BOs, the defendants are, as a matter of law, acting in violation of Section 9 of the ESA, which prohibits unauthorized take. 16 U.S.C. § 1538. While the record supports the conclusion that defendants' activities may result in take, there is no evidence that there has in fact been a take of pronghorn since the opinions were issued. Plaintiffs also argue that defendants are violating ESA Section 7(d), which provides that "[a]fter initiation of consultation required under subsection (a)(2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). There is no evidence that the activities engaged in by defendants involve the irreversible or irretrievable commitment of resources within the meaning of this section. Summary judgment is therefore granted in favor of defendants with respect to the claims made by plaintiff under Section 9 and Section 7(d).

**16.** Plaintiffs also allege that FWS did not provide for an adequate public comment period before approval of the final plan. The Court need not decide whether the FWS complied with the ESA requirement that "[t]he Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan [and] shall consider all information presented during the public comment period prior to approval of the plan," 16 U.S.C. § 1533(f)(4), since FWS will have the opportunity on remand to remedy any arguable procedural deficiencies.

Secretary and the FWS shall "to the maximum extent practicable" incorporate into each recovery plan "a description of such site–specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species." 16 U.S.C. § 1533(f)(1)(B)(i). "[W]hile the legislative history suggests that incorporation of 'site–specific management objectives' is supposed to assure that recovery plans 'are as explicit as possible in describing steps to be taken in the recovery of a species,'. . . the FWS has the flexibility under the ESA to recommend a wide range of 'management actions' on a site–specific basis." *Fund for Animals,* 903 F.Supp. at 106 (citations omitted). Plaintiffs argue that the Plan does not contain site–specific management *actions,* but provides only for further research and sets broad, unspecific goals.

The plan proposes four main categories of recovery actions: (1) "Enhance present population of Sonoran pronghorn to reach recovery goal of 300 adults. Decrease factors that are potentially limiting growth"; (2) "Establish and monitor new, separate herd(s)"; (3) "Continue monitoring the Sonoran pronghorn population. Maintain a protocol for a repeatable, comparable and justifiable survey technique"; and (4) "Verify taxonomic status of the species." Plan at 38–42. Under each action is a series of steps or tasks to be undertaken to accomplish the action. "What the ESA requires is the identification of management actions necessary to achieve the Plan's goals for the conservation and survival of the species. A recovery plan that recognizes specific threats to the conservation and survival of a threatened or endangered species, but fails to recommend corrective action or explain why it is impracticable or unnecessary to recommend such action, would not meet the ESA's standard." *Fund for Animals,* 903 F.Supp. at 108.

The Court finds that the Plan does "recommend actions or . . . steps that could ultimately lead to actions" to address the threats identified. *Id.* While some of the tasks and interim steps merely provide for further investigation or research, others are concrete, specific actions. The Court cannot say that too many of them involve only research or investigation, or that alternative or additional actions should be implemented. *See id.* ("The choice of one particular action over another is not arbitrary, capricious or an abuse of discretion simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available. The Court will not impose plaintiffs' or its own view of a better way to stem the threat posed . . . than the methods chosen by the FWS.") (citations and internal quotation marks omitted).

The Plan also states that "[t]his plan is to be short-term (about 7 years) as critical survival information is not sufficiently understood about this animal. Annual updates, rather than a new plan or major revision, will be the concept for maintaining an up-to-date recovery plan. Implementation plans will be written for each major recovery project and will provide necessary details of the project." Plan at iv. *See Fund for Animals,* 903 F.Supp. at 107–08 ("Because science and circumstances change, however, the FWS needs, and the statute provides, some flexibility as it implements the recovery plan."). The Court will defer to the agency's discretion that critical information is not sufficiently known to implement an exhaustively detailed plan at this time, and that annual updates for the short-term duration of the plan are the best method to insure that the plan is current and up-to-date. *Id.* at 107 ("It is not feasible for the FWS to attempt to address each possibility. By the time an exhaustively detailed recovery plan is completed and ready for publication, science or circumstances could have changed and the plan might no longer be suitable. Thus, the FWS recognized in the Plan that it would be reviewed every five years and revised as necessary. In these circumstances, the Court concludes that the FWS

has provided sufficient detail to satisfy the statute.").

## 2. Objective Measurable Criteria

 The ESA states that the FWS "shall, to the maximum extent practicable," incorporate into the recovery plan "objective, measurable criteria which, when met, would result in a determination ... that the species be removed from the list." 16 U.S.C. § 1533(f)(1)(B)(ii). "Congress has spoken in clarion terms: the objective, measurable criteria must be directed towards the goal of removing the endangered or threatened species from the list. Since the same five statutory factors must be considered in delisting as in listing, the Court necessarily concludes that the FWS, in designing objective, measurable criteria, must address each of the five statutory delisting factors and measure whether threats to the [species] have been ameliorated." *Fund for Animals*, 903 F.Supp. at 111 (citations omitted). Pursuant to the ESA, the five delisting factors are:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence....

16 U.S.C. § 1533(a)(1). The Plan sets forth a program and certain criteria for downlisting the species from endangered to threatened, rather than delisting altogether. Plan at iii ("The recovery objective is to remove the Sonoran pronghorn from the list of endangered species. This revision addresses first downlisting the subspecies to threatened."). The criteria set forth in the Plan for consideration of reclassifying the Sonoran pronghorn as "threatened" rather than "endangered" are either 1) when there are "an estimated 300 adult Sonoran pronghorn in one U.S. population and a second separate population is established in the U.S. and remains stable over a five year period," or 2) "numbers are determined to be adequate to sustain the population through time." Plan at 37. These criteria plainly do not address the five delisting factors. Defendants argue that the factors are otherwise addressed in the Plan in that certain recovery actions recognize, study, and attempt to address these five categories of potential threats. The fact that these factors are discussed elsewhere in the plan as areas for further research fails to satisfy the requirement that the criteria proposed for downlisting address these five factors and whether these factors pose a continuing threat to the species. Indeed, the factors are not even mentioned with respect to the criteria.

Defendants cite *Southwest Center for Biological Diversity v. Babbitt*, Civ. 98–372 TUC JMR (D.Ariz. Aug. 18, 1999), slip. op. at 12, where the court deferred to the FWS's determination that it was not practicable to incorporate the five statutory delisting factors into the objective, measurable delisting criteria in the recovery plan at issue. The court found that FWS had outlined where the record "supports the conclusion that development of delisting criteria was not practicable without first satisfying downlisting criteria," and outlined plans to research the delisting factors. *Id.* at 11–12. Here, however, defendant FWS has simply stated that the plan will first address downlisting the pronghorn to threatened, Plan at iii, without out explaining the reasoning behind that determination or outlining where the record supports that determination. The court in *Southwest Center for Biological Diversity* found that such a "conclusory statement does not alone constitute an adequate justification for the failure to incorporate delisting criteria." *Id.* at 11. Here, FWS has provided little more than

its conclusion.[17] This is insufficient to excuse compliance with the requirement to incorporate the five statutory delisting factors into the objective, measurable criteria. *See Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C.Cir.1999) ("The requirement that an agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result.... We may not supply a reasoned basis for the agency's decision that the agency itself has not given.") (citations and internal quotation marks omitted); *American Lung Ass'n v. EPA*, 134 F.3d 388, 392 (D.C.Cir. 1998) ("[J]udicial review can only occur when agencies explain their decisions with precision for it will not do for a court to be compelled to guess at the theory underlying the agency's action.") (citations and internal quotation marks omitted); *Greenpeace*, 80 F.Supp.2d at 1147 ("A biological opinion is arbitrary and capricious and will be set aside when it has failed to articulate a satisfactory explanation for its conclusions ....").

The Court will therefore remand the Plan to FWS to incorporate the criteria, or alternatively, to provide an adequate explanation as to why the delisting criteria cannot practicably be incorporated at this time.

### 3. Time Estimates

The recovery plan is required "to the maximum extent practicable" to incorporate "estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal." 16 U.S.C. § 1533(f)(1)(B)(iii). The Plan contains an "Implementation Schedule," which is a chart of the tasks listed under each of the four categories of management actions. Plan at 43–45. However, of the 23 tasks

listed, only 5 have a specific estimate of the time required to carry out that task. *Id.* at 44–45. The other 19 are described simply as "ongoing." *Id.* No time estimates are provided for the intermediate steps that are listed below certain tasks. *All* of the tasks implementing actions (2) "[e]stablish and monitor new, separate herd(s)" and (3) "[c]ontinue monitoring the Sonoran pronghorn population[, m]aintain a protocol for a repeatable, comparable and justifiable survey technique" are listed as ongoing without any specific time estimates. *Id.*

Undoubtedly, certain measures cannot be completed by a time certain, for they are by definition ongoing. For example, "protect present range" (task 1.5) will presumably continue indefinitely into the future. *Id.* at 38. However, time estimates could be provided for certain interim measures listed under that task which are not even included on the chart, such as "[i]nvestigate preferred habitat[, d]etermine areas preferred for pronghorn activities ...[,] investigate preferred forage species ...[, c]omplete a vegetation map that includes all pronghorn habitat." *Id.* (task 1.52). That such measures will be subject to ongoing revision and updating does not mean that it is not practicable to provide a time estimate within which they could initially be completed. Other tasks, such as some of the many investigation and research projects described as ongoing, do not appear to be tasks of indefinite duration. While a particular research project may require more time than is initially anticipated, the statute does not require that binding deadlines be set. It does require, where practicable, time estimates. The Court will therefore remand the Plan to FWS to provide estimates where practi-

---

17. Defendants state that because the pronghorn was listed as endangered before these statutory criteria were established, the FWS has never been required to make a determination as to which of the five factors are present with respect to the pronghorn. This does not explain why they need not make the determination at this time. The Plan also states that

"[b]ecause some significant aspects of the life history of the Sonoran pronghorn are not yet known, a delisting date cannot be projected at this time." Plan at iv. Similarly, the fact that a delisting date cannot be projected with exactitude does not explain why the delisting criteria cannot be incorporated into the Plan.

cable or to explain why estimates are not practicable for the tasks or interim measures.

In sum, the Court will grant partial summary judgment for defendants on plaintiff's Section 4(f) claim, as defendants have included in the Plan site-specific management actions for the recovery of pronghorn. The Court will grant partial summary judgment for plaintiffs on their Section 4(f) claim, as defendants have failed to incorporate into the Plan objective measurable criteria for the delisting of the pronghorn, and estimates of the time required to carry out those measures needed to achieve the plan's goal and intermediate steps toward that goal. The Court will therefore remand the Plan to the FWS for inclusion of these elements or for an explanation why their inclusion is not practicable.

D. Section 7(a)(1)—Programs for the Conservation of Endangered Species

■ Plaintiffs contend that defendants are violating Section 7(a)(1)'s requirement that the agencies "shall ... utilize their authorities in furtherance of the purposes of th[e ESA] by carrying out programs for the conservation of endangered species ...." 16 U.S.C. § 1536(a)(1). Plaintiffs claim that the defendants are violating the statute by continuing to engage in certain activities that plaintiffs allege are harmful to the pronghorn or by failing to take certain measures that plaintiffs believe will help to conserve the pronghorn. Plaintiffs cite as examples the USAF"s opposition to lowering the speed limit on State Road 85, which runs through the Organ Pipe Cactus National Monument, to facilitate movement of the pronghorn, and the military's continued training and flight activities during the fawning season. Pl. Mot. at 40–42.

Plaintiffs state that they do not intend for the Court to order defendants to implement particular conservation actions, but instead contend that defendants are not "in compliance with this [statutory] mandate in *any* respect." Pl. Opp. at 42 (emphasis in original). The record does not support a finding that defendants have failed entirely to carry out programs for the conservation of the pronghorn. Plaintiffs clearly dispute that · defendants are doing enough, and believe that the additional measures they advocate should be implemented. However, "[t]he case law is well settled that federal agencies are accorded discretion in determining how to fulfill their § 1536(a)(1) obligations.... Likewise, this court is not the proper place to adjudge and declare that defendants have violated the ESA as a matter of law by not implementing the processes listed by [plaintiff]." *Coalition for Sustainable Resources v. U.S. Forest Service*, 48 F.Supp.2d 1303, 1315–16 (D.Wyo.1999) (and cases cited therein). Therefore, the Court cannot find that defendants have failed to comply with Section 7(a)(1).

## II. NATIONAL ENVIRONMENTAL POLICY ACT CLAIMS

■ The National Environmental Policy Act ("NEPA") mandates the preparation of an environmental impact statement ("EIS") on any major federal action "significantly affecting the quality of the human environment ...." 42 U.S.C. § 4332(C).[18] Plaintiffs allege that the EISs prepared with respect to defendants' activities affecting the pronghorn are deficient in that they do not adequately address the cumulative impacts of all actions that affect the pronghorn. Defendants argue, citing *Allison v. Department of Transportation*, 908 F.2d 1024 (D.C.Cir. 1990), that they are not required to ad-

---

18. The statement shall include: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.*

dress the impacts of actions that are not related to or dependent on the proposed action at issue in an EIS. Defendants overstate the holding of *Allison,* and ignore the definition of cumulative impacts set forth in the regulations. The required scope of an EIS is defined as "the range of actions, alternatives, and impacts to be considered in an environmental impact statement." 40 C.F.R. § 1508.25. "To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts." *Id.* They include connected, cumulative, and similar actions, alternatives and mitigating measures, and impacts, which may be direct, indirect, and cumulative. *Id.* "'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions *regardless of what agency* (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

In *Allison,* petitioners asserted that the FAA "failed to analyze the cumulative impact of the proposed airport together with the impacts of other *planned but unrelated* projects in the area, in violation of applicable CEQ regulations." 908 F.2d at 1031 (emphasis added).[19] The Court of Appeals rejected that argument, holding that "[i]t is not required by the pertinent CEQ regulations to consider projects that are neither related to nor dependant on the air-

port," for 40 C.F.R. § 1508.25(a) provides that "unconnected single actions" need not be considered within the scope of an EIS. *Id.* But here, plaintiffs are not arguing that future, unrelated planned actions by other federal agencies should be considered within the scope of the EISs prepared by defendants. Rather, plaintiffs argue that the regulations require an EIS to address a proposed action's incremental impact on the pronghorn when added to the impact of other past, present, and reasonably foreseeable future federal activities that also affect the pronghorn.[20] They are clearly correct, for the regulations require agencies to consider cumulative impacts in an EIS, which are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.[21]

In reviewing a federal agency's compliance with NEPA, the Court employs a highly deferential standard of review. "Neither [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences . . . ." *Id.* (citation omitted). A court must "enforce the statute by ensuring that agencies

---

**19.** The Council on Economic Quality ("CEQ"), an agency within the Executive Office of the President, has promulgated regulations implementing NEPA that are "binding on all federal agencies." 42 U.S.C. § 4342; 40 C.F.R. § 1500.3.

**20.** As set forth above, the scope of an EIS must address certain "actions" and certain "impacts." 40 C.F.R. § 1508.25. Under the regulations, connected, cumulative and similar actions are within the scope of an EIS. *Id.* Similarly, direct, indirect and cumulative *impacts* are to be considered. *Id.* While *Allison*

reiterates that 40 C.F.R. § 1508.25(a) does not require unrelated single *actions* to be considered in an EIS, the decision does not address the requirement that cumulative *impacts* must be considered.

**21.** Plaintiffs also rely on cases that address when a single EIS addressing all regional federal activities (a "REIS") must be prepared. There has not been a showing that defendants should be required to prepare a REIS, as opposed to preparing separate EISs that address cumulative impacts under 40 C.F.R. § 1508.25 and § 1508.7.

comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results.". *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C.Cir.1991). Plaintiffs argue that defendants have failed to satisfy the requirement that they address cumulative impacts. Upon review of the EISs at issue, the discussion of cumulative impacts contained therein and the record herein, the Court finds that the EISs prepared by USAF and BLM have taken a sufficiently "hard look" at the environmental consequences of their various actions. However, the EISs prepared by USMC and by NPS with respect to Organ Pipe Cactus NM are remanded for further consideration of cumulative impacts.

The September 1998 Department of Defense/USAF Barry M. Goldwater Range Renewal Legislative EIS ("USAF LEIS") notes in its discussion of cumulative impacts U.S. Border Patrol activities, Cabeza Prieta NWR activities, BLM activities, USMC activities, and Organ Pipe Cactus NM activities. USAF LEIS 6–6 to 6–8.[22] The LEIS discusses the impacts of these activities on a variety of environmental concerns, including biological resources, wildlife, and the pronghorn in particular. USAF LEIS at 6–11 to 6–20; 6–18 to 6–20.[23] While the analysis could be more comprehensive, the Court finds this discussion to be sufficient to satisfy the regulations and the "hard look" requirement. *See* 40 C.F.R. § 1502.2(a) ("Environmental impact statements shall be analytic rather than encyclopedic.").

The 1985 BLM EIS for the Resource Management Plan ("RMP") for the Lower Gila area concludes that the proposed action may lead to positive long-term impact on pronghorn habitat, and that pronghorn would not be affected by rangeland developments recommended in the proposed action. BLM NEPA 646. Similarly, the 1990 BLM EIS addressing the Goldwater Amendment to the RMP found that the "net effect" of the proposed actions on pronghorn "will be beneficial through the long term as plant communities recover and human-pronghorn conflicts diminish." BLM NEPA 1655. There is no section entitled "cumulative impacts" and there is no discussion of other federal agency activities in the area. However, because the EISs found that the actions proposed would result in long-term benefit to the pronghorn (and by implication no incremental adverse impact), discussion of other actions by other agencies that adversely impact the pronghorn would not be necessary within the BLM EIS. *See* 40 C.F.R. § 1502.2(b) ("Impacts shall be discussed in proportion to their significance. There shall only be brief discussion of other than significant issues.").

By contrast, the January 1997 USMC Yuma Training Range Complex Final Environmental Impact Statement ("USMC EIS") fails to satisfy the regulations. While the USMC EIS contains a comprehensive discussion of the various impacts of the proposed USMC activities on the environment in general, it fails to provide sufficient analysis of cumulative impacts on the pronghorn. The USMC EIS recognizes that "cumulative impacts may result

---

**22.** Army National Guard activities on North–Tac and South–Tac are also addressed in the USAF LEIS, rather than in a separate EIS. There is no basis for the Court to conclude that ARNG activities on East–Tac impact pronghorn either directly or indirectly by increasing use of North–Tac or South–Tac. Therefore, the cumulative impacts analysis of the ARNG in its Western Army National Guard Aviation Training Site Expansion EIS need not address impacts on pronghorn.

**23.** Plaintiffs argue that the omission from the LEIS of discussion of the take authorized by the FWS by defendants' activities alone renders this and all of the other EISs deficient under the statute. The LEIS does incorporate the issue of authorized take by reference to the USAF and USMC BOs under 40 C.F.R. § 1502.21. Moreover, the Court finds no legal basis upon which to require an EIS prepared under NEPA to specifically consider authorized takes under the ESA in order to satisfy NEPA's requirement of considering cumulative impacts.

from ongoing military activities, recreational use of the Range land and wildlife management operations, and U.S. Immigration Service operations to monitor the borderlands." USMC NEPA 21265.[24] The discussion of cumulative impacts on natural resources states that "[i]mpacts to biological resources from existing and proposed Marine Corps use of the Goldwater Range result primarily from use of the airspace and vehicular use." USMC NEPA 21266. The EIS states that "[t]he proposed changes to airspace use would slightly increase the amount of noise to which wildlife are exposed to on the Cabeza Prieta NWR, and other portions of the Range. Civilian use of the airspace includes use by the U.S. Immigration Service, USFWS, and [Arizona Game and Fish Department].... Sonoran pronghorn are also exposed to noise from military aircraft and ground impacting activities on the Air Force portion of the range." Id.[25] The EIS also acknowledges that "[o]ther non-military activities potentially affecting biological resources on the Range include vehicular traffic from the U.S. Border Patrol and by the general public ... [which] could potentially disturb Sonoran pronghorn ... as well as disturb habitat." Id. at 21267. While the EIS states that noise would be increased and both the pronghorn and their habitat will be disturbed, there is no analysis of what the nature and extent of the impacts would be on the pronghorn. See Natural Resources Defense Council v. Hodel, 865 F.2d 288, 299 (D.C.Cir.1988) ("The FEIS does devote a few more sentences here to the inter-re-

gional effects on migrating species but these snippets do not constitute real analysis; they merely state (and restate) the obvious ....").[26] Because the discussion of cumulative impacts consists only of "conclusory remarks, statements that do not equip a decisionmaker to make an informed decision about alternative courses of action, or a court to review the Secretary's reasoning," id. at 298, the Court will remand the EIS for further consideration of such impacts and further revisions to the EIS as warranted.

Similarly, the NPS EIS, which was prepared in 1997 for its Organ Pipe Cactus National Monument Final General Management Plan, is deficient. In its discussion of "cumulative impacts," the EIS states that the proposed actions would result in "a negligible loss of additional wildlife habitat," since all areas of planned development are already intruded upon by humans. NPS NEPA 5059. The EIS also found that notwithstanding the monument's protection of the habitat which supports endangered species, "excessive highway mortality along State Road 85 would continue to decimate all forms of wildlife along this 27–mile road corridor." Id. The EIS concluded that because some species (such as the pronghorn) are at the boundary of their range in Organ Pipe Cactus NM, "highway mortality could possibly eliminate some species from this portion of their range as well as potentially reduce their genetic variability and reproductive fitness." Id.[27] While the section is entitled "cumulative impacts," there is no discussion of the incremental impact of this ef-

---

24. The EIS also states that existing land uses within close proximity include the Air Force section of the Range and Cabeza Prieta NWR. Id.

25. The EIS also cites research activities such as capturing and fitting pronghorn with radio telemetry equipment which may increase disturbance to the pronghorn but benefit them in the long term. Id.

26. Again, reference to the USMC BO, at USMC NEPA 21163, does not cure this deficiency as that BO is also lacking in such

analysis. Defendants also cite the discussion of cumulative impacts at USMC NEPA 21260–61, which discussed the impact of USMC action on the airspace. This discussion does not address the impact of increased use of this airspace on wildlife, but considers issues such air safety, visitor disturbance and civil/commercial aviation access and congestion.

27. There is additional discussion of the issue of highway mortality at NPS NEPA 5800–01, but no discussion of cumulative impacts.

fect "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. As in *Hodel*, 865 F.2d at 298, while "the [ ]EIS contains sections headed 'Cumulative Effects' ... nothing in the [ ]EIS provides the requisite [cumulative] analysis." This EIS is therefore remanded to the NPS for consideration and analysis of such impacts.[28]

Because the EISs prepared by USMC and NPS (Organ Pipe Cactus NM) fail to provide sufficient consideration of cumulative impacts, as required by 40 C.F.R. §§ 1508.7 and 1508.25, the Court will grant partial summary judgment to plaintiffs on their NEPA claims against these defendants. The Court will grant partial summary judgment to defendants on the NEPA claims relating to the USAF EIS and the BLM EIS. The Court will also grant partial summary judgment to defendants ARNG, INS, and NPS (Cabeza Prieta NWR) on plaintiff's NEPA claims.

### CONCLUSION

For all of these reasons, plaintiffs' motion for summary judgment is granted in part and denied in part and defendants' motion for summary judgment is granted in part and denied in part. An accompanying Order consistent with this opinion will be issued.

---

28. Neither INS nor NPS (for Cabeza Prieta NWR) have prepared EISs. Plaintiffs do not address in their opening motion the NEPA compliance of INS or NPS (with respect to management of Cabeza Prieta NWR). In opposition to defendants' motion, however, plaintiffs argue that initiation of the NEPA process by NPS and INS does not moot their claims, citing *Greenpeace*. In *Greenpeace*, the court held that re-initiation of consultation under the ESA did not moot plaintiff's claims that the existing BO was inadequate, because until a comprehensive opinion is in place, the court "retains the authority to determine whether any continuing action violates the ESA ...." 80 F.Supp.2d at 1152. Here plaintiffs are not asking that the Court review

### ORDER

Upon consideration of plaintiffs' motion for summary judgment, defendants motion for summary judgment, the oppositions thereto, the replies, and the entire record of this proceeding, it is hereby

**ORDERED** that plaintiff's motion [32–1] is **GRANTED** in part and **DENIED** in part. Partial judgment is entered for plaintiffs on Count I and Count VI. Judgment is entered for plaintiffs on Count III; and it is

**FURTHER ORDERED** that defendant's motion [58–1] is **GRANTED** in part and **DENIED** in part. Partial judgment is entered for defendants on Count I and Count VI. Judgment is entered for defendants on Count II, Count IV, and Count V; and it is

**DECLARED** that the Fish and Wildlife Service has acted in a manner that is arbitrary and capricious and contrary to law by issuing Biological Opinions that fail to address the impact of each defendant's activities on the pronghorn when added to the environmental baseline, 50 C.F.R. §§ 402.02, 402.12(g), and fail to include in the environmental baseline the impacts of all federal activities in the area in which defendants are proposing or engaging in action that may affect, directly or indirectly, the pronghorn, 50 C.F.R. § 402.02; and it is

**FURTHER ORDERED** that this matter is remanded to Fish and Wildlife Ser-

any existing NEPA document prepared by INS or by NPS on Cabeza Prieta NWR. Nor have plaintiffs requested that the Court order NPS and INS to initiate consultation under NEPA, which defendants state they either have done or intend to do. Plaintiffs have similar complaints regarding the compliance of INS, Tucson Sector and NPS, Cabeza Prieta NWR (Comprehensive Conservation Plan) with the ESA, both of which have initiated consultation but have not yet produced biological opinions. While plaintiffs argue their claims are not moot as to these two agencies, they fail to request any relief as to these defendants. The Court will therefore grant defendants summary judgment as to these claims.

vice, which has 120 days from the date of the Order to reconsider, in consultation with defendants, those portions of the Biological Opinions that have been found to be contrary to the dictates of the Endangered Species Act; and it is

**DECLARED** that the Fish and Wildlife Service has acted in a manner that is arbitrary and capricious and contrary to law by issuing a Recovery Plan that fails to establish (1) objective measurable criteria which, when met, would result in a determination that the pronghorn may be removed from the list of endangered species or, if such criteria are not practicable, an explanation of that conclusion and (2) estimates of the time required to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal where practicable, or, if such estimates are not practicable, an explanation of that conclusion; and it is

**FURTHER ORDERED** that this matter is remanded to the Fish and Wildlife Service, which has 120 days from the date of this Order to reconsider those portions of the December 1998 Final Revised Sonoran Pronghorn Recovery Plan that have been found to be contrary to the dictates of the Endangered Species Act; and it is

· **DECLARED** that the United States Marine Corps and the National Park Service (Organ Pipe Cactus National Monument) have acted in a manner that is arbitrary and capricious and contrary to law by issuing Environmental Impact Statements that fail to address the cumulative impacts of their activities on the pronghorn, when added to other past, present, and reasonably foreseeable future actions, regardless of what agency undertakes those actions, 40 C.F.R. § 1508.7; and it is

**FURTHER ORDERED** that this matter is remanded to the United States Marine Corps and the National Park Service (Organ Pipe Cactus National Monument), which have 120 days from the date of the Order to reconsider, in consultation with defendants, those portions of the Environmental Impact Statements that have been

found to be contrary to the dictates of the National Environmental Policy Act; and it is

**FURTHER ORDERED** that defendant's motion to strike [34–1] is **DENIED** as moot.