**FLORIDA KEY DEER,**
et al., Plaintiffs,

v.

**Michael D. BROWN et al., Defendants.**

No. 90–10037–CIV.

United States District Court,
S.D. Florida.

March 29, 2005.

John F. Kostsyack, Esq., National Wildlife Federation, Washington, DC, David White, Esq., Gainesville, FL, Henry Lee Morgenstern, Esq., Summerland Key, FL, for Plaintiff.

Mark Brown, Esq., Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, for Defendant.

## ORDER

K. MICHAEL MOORE, District Judge.

**THIS CAUSE** came before the Court upon Plaintiffs' Motion for Summary Judgment (DE # 188) and Defendants' Cross Motion for Summary Judgment (DE # 192).

**UPON CONSIDERATION** of the Motions, the pertinent portions of the record, having heard oral argument, and being otherwise fully advised in the premises, the Court enters the following Order.

## I. BACKGROUND

### A. Parties

Plaintiffs, the National Wildlife Federation, Florida Wildlife Federation, and Defenders of Wildlife, brought this action pursuant to the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA") on behalf of eight endangered and threatened species of the Florida Keys: the Key Largo cotton mouse, Key Deer, Key Largo woodrat, Lower Keys marsh rabbit, Schaus' swallowtail butterfly, silver rice rat, Stock Island tree snail and Key tree-cactus.[1] Defendants are Michael Brown, in his official capacity as the Undersecretary of Emergency Preparedness and Response for the Department of Homeland Security, which includes the Federal Emergency Management Agency ("FEMA") and Gale Norton, in her official capacity as Secretary of the United States Department of the Interior, which includes the Fish and Wildlife Service ("FWS").

### B. Procedural History

Plaintiffs filed this action in 1990, seeking to compel FEMA to enter into ESA consultation with FWS concerning FEMA's administration of the National Flood Insurance Program ("NFIP") in the Florida Keys. Following a bench trial, on August 24, 1994, the undersigned directed FEMA to consult with FWS in accordance with its duties under 16 U.S.C. § 1536(a)(2)("ESA § 7(a)(2)"). As a result of that consultation, FWS determined, in its 1997 Biological Opinion ("1997 BO"), that FEMA's administration of the NFIP within the Florida Keys was jeopardizing the Key Deer, Key Largo cotton mouse, Key Largo woodrat, Key tree-cactus, Lower Keys marsh rabbit, Schaus' swallowtail butterfly, silver rice rat, Garber's Sponge and Stock Island tree snail. As required by 16 U.S.C. § 1536(b)(3)(A), FWS proposed reasonable and prudent alternatives ("RPAs") which it concluded would eliminate jeopardy to these species and allow FEMA to continue implementing the NFIP in the Florida Keys. FEMA adopted the 1997 RPAs recommended by FWS as its plan for avoiding jeopardy. Plaintiffs filed an Amended Complaint in 1997 (DE # 119), claiming that the BO and accompanying RPAs recommended by FWS, and implemented by FEMA, violated both the ESA and APA.

Subsequently, in 2003, FWS and FEMA re-initiated the consultation process.[2] As a result of this re-initiation, FWS issued an amended BO ("2003 BO") regarding FEMA's NFIP in the Florida Keys. Like

---

1. With the exception of the Key tree-cactus and Schaus' swallowtail butterfly, all of the species are endemic to the Florida Keys.

2. The 1997 BO contained a re-initiation clause which required FEMA to re-initiate consultation if Monroe County did not complete a habitat recovery plan within four years. FWS A.R. # 20 at 5.5. Because Monroe County failed to complete a plan, FEMA re-initiated consultation as required.

the 1997 BO, the 2003 BO concluded that FEMA's NFIP in the Florida Keys was jeopardizing the same species as those listed in the 1997 BO, with the exception of the Garber's Sponge (hereinafter "Listed Species"). As required by law, the 2003 BO included RPAs which FEMA again adopted ("2003 RPAs").[3] Plaintiffs then filed a Second Amended Complaint (DE # 187) in 2003 challenging the sufficiency of the 2003 BO and the 2003 RPAs. The Second Amended Complaint is currently before the Court and the subject of the parties' Cross–Motions for Summary Judgement.

C. Plaintiffs' Second Amended Complaint

Count I of Plaintiffs' Second Amended Complaint alleges FWS and FEMA violated ESA § 7(a)(2) and the APA's prohibition against actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, 5 U.S.C. § 706(2)(A) ("APA § 706(2)(A)"), by failing to ensure against jeopardy. Count II alleges violations of the agencies' ESA duty to ensure against adverse modification of critical habitat ESA § 7(a)(2). Count III alleges a violation of FEMA's duty to develop and implement a conservation program for the Listed Species under 16 U.S.C. § 1536(a)(1) ("ESA § 7(a)(1)") and APA § 706(2)(A).

## II. STATUTORY FRAMEWORK

A. Administrative Procedure Act

 Review of the Defendants' actions in this case is governed by the APA. *American Rivers v. United States Army*

*Corps of Engineers,* 271 F.Supp.2d 230, 250 (D.D.C.2003)(under the ESA, agency decisions are reviewed under the APA). Under the APA, a court shall hold unlawful and set aside agency actions, findings or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In reviewing agency actions, the court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), to determine whether the agency has "examined the relevant data and articulated a satisfactory explanation for its actions ...." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In this review, the court considers whether "the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt,* 903 F.Supp. 96, 105 (D.D.C.1995). Under this standard, an action will be set aside if the agency has relied on factors which Congress had not intended it to consider, failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it can not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43, 103 S.Ct. 2856.

B. Endangered Species Act

The ESA is "the most comprehensive legislation for the preservation of endan-

---

**3.** Plaintiffs contend, and Defendants do not dispute, that the 2003 RPAs are materially identical to the 1997 RPAs. Def. Mot. For

Summ. J. at 1. (FWS reaffirmed the RPA, and FEMA has elected to continue implementing the RPA).

gered species ever enacted by any nation." *TVA v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Its stated purpose is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered and threatened species ...." 16 U.S.C. § 1531(b). "[T]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *TVA,* 437 U.S. at 184, 98 S.Ct. 2279. In particular, the ESA directs federal agencies "to use ... all methods and procedures which are necessary to preserve the endangered species." *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 125 (D.D.C.2001) (citations omitted).

Section 7(a)(1) of the ESA requires all federal agencies, in consultation with FWS, to use their authority to further the goals of the ESA by carrying out programs for the conservation of endangered and threatened species. Under ESA § 7(a)(2), when any action authorized, funded, or carried out by a federal agency may potentially affect a listed species, that agency must consult with FWS to insure that the agency's activities are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." FWS is then required, under Section 7(b) of the ESA, to issue a biological opinion on whether the agency action is likely to jeopardize the continued existence of the species. If FWS concludes that the agency's actions are likely to jeopardize an endangered or threatened species, FWS is then required, under ESA § 7(b)(3)(A), to suggest "reasonable and prudent alternatives." Reasonable and prudent alternatives are defined as:

alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.02. Under this definition, reasonable and prudent alternatives must: (1) be consistent with the purpose of the underlying action; (2) be consistent with the acting agency's authority; (3) be economically and technically feasible; and (4) avoid the likelihood of jeopardy or adverse modification. *Greenpeace v. National Marine Fisheries Service,* 55 F.Supp.2d 1248, 1264 (W.D.Wash.1999).

Once FWS suggests reasonable and prudent alternatives, the acting agency is then required to consider the alternatives, and adopt a strategy fulfilling its Section 7(a)(2) duties. 50 C.F.R. § 402.14(h)(3); *Rancho Viejo, LLC v. Norton,* 323 F.3d 1062, 1064 (D.C.Cir.2003). Only after the federal agency complies with Section 7(a)(2) can that agency action go forward. *Pacific Coast Federation of Fishermen's Assoc. v. U.S. Bureau of Reclamation,* 138 F.Supp.2d 1228, 1242 (N.D.Cal.2001) (citations omitted).

## III. SUMMARY JUDGEMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure:

The judgment sought shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces genuine issue of material fact, then the court should not grant summary judgment." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir.1995). Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In applying this standard, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *Id.*

However, the non-moving party may not "rest upon the mere allegations and denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of scintilla of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The non-moving party must raise significant probative evidence suffi-

cient for a jury to find in their favor. *See LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir.1998). In fact, "the plain language of Rule 56(c) mandates entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The failure to present proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *Id.*

Finally, when applying the APA to review administrative actions under the ESA, the court resolves the issues based on the agency's administrative record, a trial is generally unnecessary, and summary judgment is often appropriate. *Loggerhead Turtle v. County Council of Volusia Cty., Fla.*, 120 F.Supp.2d 1005, 1011 (M.D.Fla.2000)(citing *Fla. Fruit & Veg. Ass'n. v. Brock*, 771 F.2d 1455, 1459 (11th Cir.1985), *cert. denied*, 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986))(the summary judgment procedure is particularly appropriate in cases in which the court is asked to review ... a decision of a federal agency).

## IV. AGENCY ACTION

Plaintiffs challenge three agency actions: (1) FWS's preparation of the 2003 BO; (2) FWS's recommendation of the 2003 RPAs; and (3) FEMA's adoption of the 2003 RPAs.[4] Defendants do not dispute that these are agency actions subject to review

4. While Plaintiffs also challenge FEMA's failure to implement any conservation plan for the Listed Species, this is not challenging an agency action, per se, as it challenges the agency's failure to act.

**1352**

under the APA. Accordingly, this Court must determine whether the 2003 BO and the 2003 RPAs are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

### A. Biological Opinion(s)

In the 1997 BO FWS concluded that FEMA's NFIP, as administered in the Florida Keys, was jeopardizing the existence of the Listed Species and adversely modifying the habitat of the silver rice rat. FWS A.R. # 20 at 5.1. The 1997 BO identified habitat loss and fragmentation as the primary factors jeopardizing the Listed Species. *Id.* With the exception of the Garber's Sponge, the 2003 BO came to these same conclusions. FWS A.R. # 88 at 55.

### B. Reasonable and Prudent Alternatives

The 1997 RPAs recommend that FEMA, FWS and Monroe County reconcile digital data produced by FWS concerning suitable and unsuitable species habitat with base mapping contained in Monroe County's Geographical Information System. Def. Mem. at 8; FWS A.R. # 88 at 57. In accordance with this process, a Monroe County staff person assists permit applicants in reviewing a list of real estate lot numbers corresponding to areas that FWS has identified as outside the habitat of the covered species. *Id.* If the particular lot is not on the list, and therefore not within suitable habitat for the covered species, the permit application is not referred to FWS for coordination. *Id.* On the other hand, if the lot is on the list, and therefore within the habitat of the covered species, the permit applicant is referred to FWS to obtain technical assistance. *Id.*

Once the application is referred, FWS then determines whether the project is "likely to adversely affect" the Listed Species or critical habitat. *Id.* If FWS determines that the project may adversely affect a covered species or critical habitat, FWS works with the participating community and the landowner to ensure compliance with ESA section 7 and section 10. *Id.* A copy of a section 10 permit or the section 7 consultation outcome is placed in the community's building permit file. *Id.* If the project may adversely affect a listed plant, FWS would provide recommendations on avoiding or minimizing those effects. *Id.*

## V. DISCUSSION

### A. Count I

Count I of the Second Amended Complaint alleges that the 2003 BO violates ESA § 7(a)(2) and APA § 706(2)(A) because it fails to consider FEMA's NFIP after adoption of the RPAs in 1997. Count I also alleges that FWS's recommendation, and FEMA's subsequent adoption of the 2003 RPAs was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law because the 2003 RPAs fail to remove jeopardy to the Listed Species. Accordingly, the Court will consider the sufficiency of both the 2003 BO and the 2003 RPAs. Additionally, this Court will consider whether FEMA's adoption of the RPAs as its plan to remove jeopardy ("the Plan") was reasonable.

#### 1. Did FWS adequately consider all relevant factors in the 2003 BO?

Plaintiffs contend that the 2003 BO violates ESA § 7(a)(2) and is otherwise arbitrary and capricious because it fails to consider the NFIP after the adoption of the 1997 RPAs. Pl. Mem. at 22. Specifically, Plaintiffs argue that the baseline

analysis section of the 2003 BO should have included an evaluation of FEMA's NFIP after adopting the 1997 RPAs because the NFIP program, as augmented by the 1997 RPAs, constituted federal action. *Id.* Defendants disagree, arguing that "a biological opinion typically does *not* discuss how RPA[s] affect the environmental baseline, because such analysis is included in future biological opinions ...." Def. Mem. at 22; Def. Reply at 11.

The Court will first consider whether FWS should have evaluated the NFIP as augmented by the 1997 RPAs in the 2003 BO. If the Court finds that this information should have been included in the 2003 BO, the Court will then consider whether the 2003 BO contains this analysis.

 a. Did FWS have to evaluate FEMA's NFIP, as augmented by the 1997 RPAs, in the 2003 BO?

■ As discussed *supra,* ESA § 7(a)(2) requires a federal agency to consult with FWS when any action authorized, funded, or carried out by the agency may affect a listed species. Once consultation is initiated FWS must:

(1) review all relevant information; (2) evaluate the current status of the listed species; (3) evaluate the effects of the action and the cumulative effects on the listed species or critical habitat and (4) formulate a biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of the listed spe-

cies or result in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.14(g)(1–4). In evaluating the "effects of the action" FWS must consider the "direct and indirect effects of an action ... that will be added to the environmental baseline." 50 C.F. R. § 402.02. The environmental baseline includes "the past and present activities of all federal ... actions ... in the action area." *Id.* Finally, the biological opinion is required to contain a "detailed discussion of the effects of the action on the listed species." 50 C.F.R. § 402.14(h)(2). Accordingly, the Court finds that an analysis of the effect of FEMA's adoption of the 1997 RPAs on the Listed Species should have been included in the 2003 BO. *See Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 126–8 (D.D.C.2001).

First, FEMA's adoption of the 1997 RPAs as its Plan to remove jeopardy to the Listed Species was a decision with legal effect and constituted a "federal action" for purposes of the sufficiency of the 2003 BO under the requirements of the ESA.[5] *See Greenpeace v. Nat'l Marine Fisheries Serv.,* 237 F.Supp.2d 1181, 1200 (W.D.Wash.2002). As a result, the effect of implementing the 1997 RPAs on the Listed Species constituted "past or present federal action" and should have been included in the baseline analysis of the 2003 BO. *See* 50 C.F.R. § 402.02.

Second, when reviewing agency decisions under the APA, this Court is required to consider whether the agency

---

5. 50 C.F.R. § 402.02 defines an action as:
 all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. *Examples include,* but are not limited to: (a) *actions intended to conserve Listed Species or their*

*habitat;* (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air...
(emphasis added)

considered all relevant information. *See supra* II(A). When FWS prepared the 2003 BO, information regarding whether the 1997 RPAs successfully removed jeopardy to the Listed Species was available. Such information was relevant in light of FWS's decision to recommend the same RPAs in 2003 that it had recommended five years earlier.[6] Accordingly, even assuming Defendants are correct that the regulations discussed above did not require FWS to evaluate the effect of the 1997 RPAs on the Listed Species in the 2003 BO, this information was clearly relevant and therefore should have been included. *Id.*

b. Does the 2003 BO adequately evaluate FEMA's NFIP in the Florida Keys with the RPA in place?

A review of the 2003 BO reveals that there is almost no discussion of the effect of the NFIP on the Listed Species after adoption of the RPAs in 1997. While there is a discussion of the population trends of the Key Deer[7], the 2003 BO contains no discussion of the population trends of the other Listed Species.[8] In addition, while habitat loss and fragmentation are the undisputed causes of jeopardy, there is no discussion of how the adoption of the 1997 RPAs affected habitat loss and fragmentation.

The Court therefore finds that the 2003 BO failed to evaluate whether FEMA's NFIP was continuing to jeopardize the Listed Species after implementation of the 1997 RPAs. Accordingly, the 2003 BO violates the ESA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because it plainly failed to consider relevant information. *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, 103 S.Ct. 2856. As a result, Plaintiffs' Motion for Summary Judgment is Granted on Count I with respect to FWS's preparation of the 2003 BO.

2. Do the 2003 RPAs fail to protect against jeopardy?

■ The parties do not dispute that in order to comply with the ESA, an agency whose actions have been found to jeopard-

**6.** The Court notes that generally, when recommending reasonable and prudent alternatives, FWS does not have information available regarding whether the alternatives will actually be successful in removing jeopardy. This is not the case here, as FWS recommended the same RPAs that were already in place.

**7.** *See Gifford Pinchot Task Force v. United States Fish and Wildlife Service*, 378 F.3d 1059, 1067 (9th Cir.2004)(focusing on actual species count is an overly narrow interpretation of what is required under the jeopardy prong).

**8.** Furthermore, to the extent that FWS contends that the 2003 BO's discussion of the Key Deer's population trend might somehow fulfill their duty to evaluate past federal action, or validate the 2003 RPAs, they are

directly contradicted by the 2003 BO. First, although Defendants are correct in asserting that the Key Deer's estimated population has increased from 250–300 to 700–800, the record is not clear about when this population increase occurred. FWS A.R. # 88 at 9 ("In 1970 the Key Deer population was estimated at 250–300 individuals ... the population has most recently been estimated at 700–800 individuals"). More importantly, the 2003 BO notes that there has been a contraction in the range of the Key Deer, and as a result, "this contraction in range has decreased the overall viability of the Key Deer population." *Id.* Accordingly, to the extent that the 2003 BO discusses the effect of the NFIP after adoption of the 1997 RPAs, this discussion only highlights the ineffectiveness of the 1997 RPAs and illustrates how evaluating the effects of the 1997 RPAs would have compelled FWS to recommend different RPAs in 2003.

ize an endangered or threatened species must implement a plan that avoids such jeopardy. Pl. Mem. at 10; Def. Mem. at 13; *Southwest Center for Biological Diversity v. United States Bureau of Reclamation,* 143 F.3d 515, 523 (9th Cir.1998). Here, FWS by recommending the 2003 RPAs, and FEMA by implementing the 2003 RPAs as their Plan to remove jeopardy, have necessarily concluded that the 2003 RPAs satisfy this no jeopardy standard. Thus, the Court must determine, under the "arbitrary and capricious" standard of review, whether the 2003 RPAS are likely to remove jeopardy to the Listed Species. *Greenpeace v. National Marine Fisheries Service,* 55 F.Supp.2d 1248, 1267 (W.D.Wash.1999)("under the arbitrary and capricious standard of review, the government must establish that its reasonable and prudent alternatives fulfill their purpose of avoiding the likelihood of jeopardizing the continued existence of the listed species . . .")(internal quotation marks omitted).

Plaintiffs allege that the 2003 RPAs fail to meet the requirements of the ESA and are therefore arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law because they illegally: (1) rely on voluntary measures; and (2) do not protect against habitat loss and fragmentation or otherwise account for the cumulative effects of the permitted projects within the suitable habitat of the Listed Species. Pl. Mem. at 18.

a. Do the 2003 RPAs illegally rely on voluntary measures?

■ Mitigation measures under the ESA must be reasonably specific, certain

to occur and subject to deadlines or other forcible obligations. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 254 F.Supp.2d 1196 (D.Or.2003); *American Rivers,* 271 F.Supp.2d 230, 253 (D.D.C. 2003)(no jeopardy finding under the ESA must have a reasonable *certainty* of occurring, not just a reasonable chance)(emphasis in original). Plaintiffs allege that the 2003 RPAs violate the ESA because they illegally rely on voluntary measures. Defendants disagree on two grounds. First, Defendants argue that "FEMA must reinitiate consultation if any unauthorized taking of a listed species occurs or if new information reveals additional effects not considered in the RPA." FWS A.R. # 20 at 5.5; FWS Supp. A.R. # 88 at 60; Def. Mem. at 20. Second, Defendants contend that the RPA does not illegally rely on voluntary measures because "if the County fails to abide by its agreement with FEMA to continue the screening process, FEMA may treat any such failure as a violation of the NFIP's community eligibility requirements and commence any appropriate probation or suspension procedures." FWS A.R. # 37 at 5.3; FWS Supp. A.R. 88 at 57–58; Def. Mem. at 20.

■ The Court finds both of Defendants' arguments unpersuasive. First, the re-initiation requirement does nothing to compel the landowners to adhere to recommendations made by FWS. Indeed, the record indicates that some landowners entirely disregarded the 1997 RPAs.[9] Also, the re-initiation clause does not provide for restoration of habitats that are destroyed nor does it provide for any consequences to landowners that destroy habitat without consulting FWS. Furthermore, FEMA did not re-initiate consultation when landown-

---

9. *See* Pl.Ex. 4 at Pt. II (eight projects destroyed habitat without FWS review; in no

case did FEMA re-initiate consultation with FWS).

ers destroyed habitat without consulting with FWS. *Id.* Accordingly, the record reveals that this re-initiation requirement does not ensure that the procedures proscribed in the RPAs are reasonably specific, certain to occur and subject to deadlines or other forcible obligations.[10]

Defendants' second argument, that the RPA does not rely on voluntary measures because FEMA *"may* treat the County's failure to abide by the screening process as a violation of the NFIP community eligibility requirements" is disingenuous at best. *Id.* (emphasis added). On its face, this provision is voluntary. Thus, it does nothing to ensure that either the county or the landowners will comply with the RPAs' procedures.

In addition, the record repeatedly illustrates the uncertainty of whether the procedures proscribed in the 1997 RPAs will be followed. For example, the 2003 RPAs do not *require* FWS to make recommendations to projects within the suitable habitat of the Listed Species, rather they may do so at their own discretion. Indeed, the administrative record indicates that only a small percentage of applications within suitable habitat actually received conservation recommendations from FWS. *See supra,* IV(2)(b). In some cases where recommendations were made, they were not adopted by the landowners. FWS. Supp. A.R. # 52. Finally, Defendants admit that the "RPA *presumes* that individual developers will comply with recommendations provided by FWS through the permit coordination process." Def. Proposed Findings of Fact and Conclusions of Law at ¶ 37(emphasis added). Accordingly, the

Court finds that the 2003 RPAs illegally rely on voluntary conservation measures.

b. Do the 2003 RPAs account for the cumulative effects of the proposed projects and protect against habitat loss and fragmentation?

■ Plaintiffs maintain that the 2003 RPAs are insufficient because they provide for a review of proposed projects on a project by project basis and therefore do not take into account the cumulative effect of the thousands of small-scale projects permitted to go forward in the habitat of the Listed Species. Pl. Reply at 5. Defendants again disagree, arguing that "[j]eopardy is avoided—both on a project specific and on a programmatic basis—because the RPA enables FWS to provide technical assistance concerning appropriate measures to avoid and minimize impacts to a Listed Species." Def. Mem. at 16. Upon a review of the administrative record, the Court again finds Defendants' arguments unpersuasive.

The record shows that between July of 1998 and October of 2002, approximately 2,557 projects were identified as being located within the suitable habitat of the Listed Species. Pl. Mem. at 13; Pl.Ex. 4.; FWS Supp. A.R. # 89 and # 89a. Of the 2,557 projects located within the suitable habitat of the Listed Species, 2,034 were reviewed by FWS pursuant to the RPAs' procedures.[11] *Id.* From these 2,034 project reviews, FWS authorized 2,022 to proceed and delayed 12 of them. *Id.* Of the 2,022 projects authorized to proceed, FWS determined that 2,006 of them were not

---

**10.** FEMA has not re-initiated consultation even though unauthorized projects have gone forward which resulted in destruction to suitable habitat. *Id.*

**11.** The other 523 projects were section 7 consultations on U.S. Army Corps of Engineers permit applications and therefore not reviewable by FWS.

likely to adversely affect Listed Species or critical habitat.[12] *Id.* Of the remaining 16 projects authorized to go forward, FWS concluded that: five of them did not affect a Listed Species; three of them were not FEMA insured projects; and eight of them could proceed after implementing changes aimed at protecting the Listed Species. *Id.* FWS did not find that any of the 2,022 projects permitted to go forward in the suitable habitat of the Listed Species would cause jeopardy.[13]

Defendants' contend that the amount of projects permitted to go forward within the suitable habitat does not show that the 2003 RPAs fail to protect the Listed Species from jeopardy because the majority of the projects were insignificant. Def. Reply at 6. Again, the record does not support Defendants' argument. For example, of the 2,022 projects allowed to go forward in the suitable habitat, 101 of them were fences on Big Pine and No Name Keys. FWS Supp. A.R. 89. These are the very locations where the Key Deer's survival is at risk, *due to fencing* (1997 BO at 3.22)(emphasis added). Similarly, FWS found that a 15-unit housing project was not likely to adversely affect the Listed Species even though the project site was used by the Key Deer and considered by FWS to be "environmentally sensitive." FWS Supp. A.R. # 65 (8/10/01 and 8/12/99 letters).

Furthermore, Plaintiffs are correct in arguing that the 2003 RPAs illegally fail to consider the cumulative effect of the permitted projects. Both of the biological opinions conclude that developments in the habitat of the Listed Species "taken together, will result in jeopardy." Def. Reply at 8. However, the 2003 RPAs do not address this cause of jeopardy. Rather, by providing for a project by project review, it is unlikely that FWS will conclude under the 2003 RPAs that a single project will cause jeopardy. Indeed, as discussed above, the record reveals that FWS did not prohibit a single project from proceeding based on the projects possible affect on the suitable habitat of the Listed Species. Accordingly, this piecemeal review is inconsistent with the conclusions of FWS that habitat loss and fragmentation "taken together" cause jeopardy to the Listed Species.

Finally, both the 1997 BO and the 2003 BO list many secondary effects of development in the Florida Keys as threats to the Listed Species. For example, increased traffic, illegal dumping, mortality from pets (especially cat predation), loss of fresh water (fertilizers degrading water quality), exotic fire ants, exotic vegetation, pesticide use and man-induced fires are mentioned as secondary threats. FWS A.R. # 20 3.21–4.17. None of these effects are accounted for in the 2003 RPAs.

c. The 2003 RPAs fail to protect against jeopardy.

In summation, the record reveals that the 1997 RPAs illegally relied on voluntary measures and actually affected only eight

---

12. There does not appear to be any record of FWS's review of these 2,006 projects.

13. Of the 12 delayed projects, nine of them were FEMA insured projects affecting Listed Species which proceeded after obtaining incidental take permits. FWS Supp. A.R. # 89 and # 89a. Two of them affected un-listed species and the final one was not a FEMA insured project. *Id.* Accordingly, in none of these projects did the RPAs protect the Listed Species because, by definition, incidental take permits allow for a "taking" of a listed species.

projects, out of the more than two thousand permitted to go forward *within the suitable habitat* of the Listed Species. In addition, the 1997 RPAs do not account for the cumulative or secondary effects of any of the projects. For these reasons, the Court finds that the 2003 RPAs, which merely re-adopt the 1997 RPAs, run counter to the evidence before FWS at the time the 2003 BO was issued and the 2003 RPAs proposed, do not protect against jeopardy, and are therefore invalid under the APA.[14] *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, 103 S.Ct. 2856. Accordingly, Plaintiffs' Motion for Summary Judgment on Count I is Granted with respect to FWS's recommendation of the 2003 RPAs.

3. Was FEMA's adoption of the 2003 RPAs arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law?

 Following the issuance of a biological opinion, the action agency determines whether, and in what manner to proceed with the action, in light of its ESA section 7 obligations and the biological opinion. The ultimate responsibility for determining whether section 7 of the ESA has been satisfied rests with the federal agency that was engaged in consultation. *Natural Resources Defense Council v. Army Corp. Of Engineers*, Case No.99–2899–CIV, 2001 WL 1491580 at *6 (S.D. Fla. June 28, 2001). While consultation may satisfy the action agency's *procedural* obligations under the ESA, the action agency cannot rely solely on the consulting agency's recommendations to conclusively establish its compliance with the *substan-*

*tive* requirements of the ESA. *Pyramid Lake Tribe of Indians v. United States Dept. of Navy*, 898 F.2d 1410, 1415 (9th Cir.1990) (citations omitted)(emphasis added). In other words, a federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on the recommendations of the consulting agency must not have been arbitrary and capricious.

Plaintiffs maintain that FEMA provided "no analysis to support the adoption of the RPA, and instead relied entirely on FWS's analysis." Pl. Proposed Findings of Fact and Concl. of Law. at ¶s 28–29. As a result, Plaintiffs contend that FEMA is liable under the ESA and the APA for failing to consider relevant factors and otherwise acting arbitrarily. *Id.* FEMA, disputing liability under the ESA and the APA, argues that "[t]he fact that FEMA is implementing the RPA recommended by FWS is evidence that FEMA is not violating the ESA or otherwise acting in an arbitrary or capricious fashion." Def. Mem. at 19. Accordingly, it appears that FEMA concedes that it engaged in no independent analysis of the sufficiency of the 2003 RPAs, and maintains that its reliance on FWS's recommendations was appropriate under the ESA and the APA.

While the Court agrees with FEMA that it can rely on the recommendations of FWS, the Court does not agree with FEMA's contention that it can do so without engaging in *any* independent analysis. Under the APA, an agency must consider relevant information before acting. Here, FEMA has clearly passed all of its substantive obligations under the ESA to

---

14. FWS's own expert, in 1999, admitted that "the RPA doesn't do enough." FEMA Supp.

A.R. # 31.

FWS. This it cannot do. As a result, FEMA's admitted failure to engage in any independent consideration of the sufficiency of the 2003 RPAs renders its actions arbitrary and capricious.

Accordingly, Plaintiffs' Motion for Summary Judgement on Count I is granted with respect to FEMA's adoption of the 2003 RPAs.

### B. Count II

██ Plaintiffs allege, in Count II of their Complaint, that the 2003 RPAs do not adequately protect against adverse modification of the critical habitat of the silver rice rat. Second Amended Compl. ¶ 45–9. The ESA requires each federal agency to "insure that any action ... is not likely to jeopardize the continued existence of any endangered species ... or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(1). An action results in jeopardy when it "directly or indirectly ... reduces appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers or distribution of that species." 50 C.F.R. § 402.02. Adverse modification, on the other hand, is "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species ...." *Id.* Accordingly, under the ESA, adverse modification of critical habitat and jeopardy should be evaluated separately. *Greenpeace,* 55 F.Supp.2d at 1265 (explaining that, although there is considerable overlap between adverse modification and jeopardy, the ESA establishes two separate standards to be considered).

Plaintiffs claim that FWS's failure to evaluate whether FEMA's NFIP was ad-

versely modifying the critical habitat of the silver rice rat separately from its analysis of whether the NFIP was causing jeopardy in the 2003 BO violates the ESA. Pl. Mem at 24. Therefore, Plaintiffs maintain that the 2003 RPAs fail to protect against adverse modification of the critical habitat of the silver rice rat. *Id.* Defendants, on the other hand, contend that the 2003 RPAs adequately protect against adverse modification of the critical habitat because the 2003 RPAs "consultation area includes all silver rice rat critical habitat" that is subject to NFIP-sponsored flood insurance. Def. Reply at 13. Defendants also argue that a single RPA sufficiently protects against adverse modification of critical habitat and jeopardy because habitat modification is the stated cause of jeopardy. Def. Mem. at 25.

██ While Defendants' arguments are reasonable, they cannot justify FWS's failure to address the sufficiency of the 1997 and 2003 RPAs in protecting against adverse modification of the critical habitat of the silver rice rat after the fact. Instead, to comply with the requirements of the ESA, FWS should have addressed the effect of the 1997 RPAs on the critical habitat of the silver rice rat in the 2003 BO, and provided an explanation for why a single RPA in 2003 was sufficient to remedy adverse modification and jeopardy. *Greenpeace,* 55 F.Supp.2d at 1265 (if a federal agency addresses adverse modification and jeopardy in a single RPA, it should provide an explanation for why it is doing so). FWS's failure to do so renders its actions its actions arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43.

Accordingly, Plaintiff's Motion for Summary Judgement on Count II is GRANT-

ED with respect to FWS.[15]

## C. Count III

In Count III of their Complaint, Plaintiffs claim that FEMA has failed to develop a conservation program for the Listed Species. ESA § 7(a)(1) requires each federal agency "in consultation with and with the assistance of [FWS] to adopt programs for the conservation of endangered species." *Sierra Club v. Glickman*, 156 F.3d 606, 618 (5th Cir.1998). Federal law defines "conservation" as: "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C.A. § 1532(3). Therefore, to fulfill the requirements of ESA § 7(a)(1) a federal agency must develop a program aimed at improving the viability of a species so that it eventually may be de-listed. In fulfilling the requirements of ESA § 7(a)(1), as long as an agency has implemented a program aimed at conservation, the "court is not the proper place to adjudge and declare that defendants have violated the ESA as a matter of law by not implementing the processes listed by [plaintiff]." *Defenders of Wildlife*, 130 F.Supp.2d at 135.

FEMA argues that it has fulfilled its ESA § 7(a)(1) duty by continuing to implement provisions in its Community Rating System ("CRS") to promote the implementation of habitat conservation planning.[16] Def. Mem. at 29. Under this program FEMA provides incentive credits to communities that develop and implement habitat conservation plans to benefit threatened and endangered species. *Id.* FEMA admits that Monroe County is currently ineligible to receive credits. *Id.* Nevertheless, FEMA contends that ESA § 7(a)(1) is appropriately viewed within the overall context of the NFIP nationwide, and not solely within Monroe County. *Id.* In support of this argument Defendant relies on *Oregon Nat'l Resources Council v. United States Army Corps of Engineers*, Case No. 00–431–JO, 2003 WL 117999 (D.Or. Jan. 2, 2003)("*ONRC*").

In *ONRC*, the plaintiff challenged defendant's conservation program for the coho salmon. *Id.* In dismissing plaintiff's claim, the court held that plaintiff had not stated a cause of action under ESA § 7(a)(1) because they alleged that defendant's conservation plan was insufficient, not that defendant had failed to develop a plan. *Id.* The court noted that "if *ONRC's* claim is that the Corps has failed to *formulate* its conservation program in accordance with ESA § 7(a)(1), it may file an amended complaint within ten days."[17] *Id.* at *5(emphasis added). As a result, FEMA has improperly relied on *ONRC* because Plaintiffs'

---

**15.** In addition, as discussed above, FEMA's adoption of the 2003 RPAs was arbitrary and capricious. *See supra* V(A)(3). Therefore, Plaintiffs' Motion for Summary Judgement on Count II is GRANTED with respect to FEMA.

**16.** FEMA also contends that it has fulfilled its ESA § 7(a)(1) duties by appointing a staff person to attend inter-agency meetings concerning a south Florida multi-species recovery plan. While it seems appropriate that FEMA send a staff person to these meetings given the fact that their NFIP is a main cause of the decline of the Listed Species, FEMA does not point to any evidence of how attendance at these meetings might somehow satisfy its ESA § 7(a)(1) duty.

**17.** Furthermore, contrary to FEMA's contentions, neither *ONRC*, nor any other case cited by Defendants stands for the proposition that an agency can rely on a national conservation program that is not aimed at, and has no effect on, the conservation of the particular Listed Species at issue in the consultation.

claim in this case specifically alleges that FEMA has failed to "identify or implement *any* program for conserving the Covered Species." Pl. Compl. at ¶ 55 (emphasis added). Thus, the Court must determine whether the CRS program satisfies FEMA's ESA § 7(a)(1) duty to develop a conservation program concerning the Listed Species.

 Under ESA § 7(a)(1) an agency has a specific, rather than a generalized duty to conserve species. *Sierra Club v. Glickman,* 156 F.3d 606, 618 (5th Cir. 1998); *Defenders of Wildlife v. Secretary, U.S. Dept. of the Interior,* 2005 WL 221253 (D.Or. Jan. 31, 2005). Currently, as discussed *supra,* Monroe County is prohibited from participating in the CRS program because of noncompliance with the program's standards. As a result, if this Court were to adopt FEMA's argument it would mean that a federal agency could fulfill its ESA § 7(a)(1) conservation duty by implementing a voluntary national program that has *no* effect on the specific species affected by the agency's actions. Such a holding would be inconsistent with the plain reading and intent of ESA 7(a)(1).[18]

Accordingly, the Court finds that FEMA has failed to implement any conservation plan with respect to the Listed Species as required by ESA § 7(a)(1) and Plaintiffs are entitled to summary judgement on Count III.

## VI. CONCLUSION

Based on the foregoing it is ORDERED AND ADJUDGED as follows:

1) Plaintiffs' Motion for Summary Judgment is GRANTED on Counts I, II and III;

2) Defendants' Motion for Summary Judgment is DENIED;

3) The parties shall report for a status conference on Tuesday, April 12, 2005, at 9:30 a.m. in Courtroom Three, Eleventh Floor, James Lawrence King Federal Justice Building at 99 N.E. 4th Street, Miami, Florida.

---

**18.** As discussed above, section 7(a)(1) of the ESA directs agencies to develop conservation plans aimed at de-listing the particular species. Allowing a federal agency to satisfy this requirement without having any affect on the specific species would undermine the intent of this statute.