[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 05-16374

———————————————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 1, 2008
THOMAS K. KAHN
CLERK

D.C. Docket No. 90-10037-CV-KMM

FLORIDA KEY DEER (Odocoileus virginianus clavium),
NATIONAL WILDLIFE FEDERATION, et al.,

Plaintiffs–Appellees,

versus

R. DAVID PAULISON, in his official capacity as
Acting Director of The Federal Emergency Management
Agency, an Agency of the United States of America,
P. LYNN SCARLETT, in her official capacity as Secretary
of the United States Department of the Interior,

Defendants–Appellants.

———————————————

Appeal from the United States District Court
for the Southern District of Florida

———————————————

**(April 1, 2008)**

Before ANDERSON and BARKETT, Circuit Judges, and TRAGER,[*] District
Judge.

———————————————

   [*] Honorable David G. Trager, United States District Judge for the Eastern District of New
York, sitting by designation.

BARKETT, Circuit Judge:

The Federal Emergency Management Agency ("FEMA") and the U.S. Fish and Wildlife Service ("FWS") appeal from an adverse summary judgment and grant of injunctive relief. The district court found that FEMA and the FWS failed to comply with section 7 of the Endangered Species Act, with regard to FEMA's administration of the National Flood Insurance Program in the Florida Keys.[1] FEMA and the FWS maintain that section 7(a)(2) of the Endangered Species Act does not apply to FEMA's provision of flood insurance and that FEMA has, in any event, fully complied with section 7. We affirm.

## I. STATUTORY FRAMEWORK

To resolve the questions before us, we must first address the interaction between two congressional mandates: the National Flood Insurance Act of 1968, 42 U.S.C. §§ 4001–4129, and the Endangered Species Act of 1973, 16 U.S.C.

---

[1] The plaintiffs–appellees in this case are three environmental organizations and eight endangered or threatened species. The organizations are the National Wildlife Federation, the Florida Wildlife Federation, and the Defenders of Wildlife. The endangered or threatened species are the Florida Key deer, the Key Largo cotton mouse, the Key Largo woodrat, the Key tree-cactus, the Lower Keys marsh rabbit, the Schaus' swallowtail butterfly, the silver rice rat, and the Stock Island tree snail.

The defendants–appellants are R. David Paulison and P. Lynn Scarlett in their respective official capacities as the acting head of FEMA and the Secretary of the U.S. Department of the Interior, of which the FWS is a part. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Scarlett has been automatically substituted as a party and in the caption for the former acting Secretary. For ease, we refer to the defendants as FEMA and the FWS.

Amici Curiae the Pacific Legal Foundation, Monroe County, and the National Association of Home Builders filed briefs in support of the appellants. Amicus Curiae Taxpayers for Common Sense filed a brief in support of the appellees.

§§ 1531–1544.

## A. The National Flood Insurance Act

Congress passed the National Flood Insurance Act of 1968 ("NFIA") to provide affordable flood insurance throughout the nation and to encourage sensible land use that would minimize the exposure of property to flood damage and loss. 42 U.S.C. § 4001(d)–(f); Flick v. Liberty Mut. Fire Ins. Co., 205 F.3d 386, 388 (9th Cir. 2000). Toward that end, the NFIA authorizes FEMA to establish and carry out the National Flood Insurance Program ("NFIP"). 42 U.S.C. § 4011.

Before insurance is provided within a community, however, the NFIA requires that the community satisfy certain eligibility criteria. Specifically, FEMA is required to issue flood insurance only once it has determined that a community has:

> (1) evidenced a positive interest in securing flood insurance coverage under the flood insurance program, and
> (2) given satisfactory assurance that by December 31, 1971, adequate land use and control measures will have been adopted for the State or area (or subdivision) which are consistent with the comprehensive criteria for land management and use developed under section 4102 of this title, and that the application and enforcement of such measures will commence as soon as technical information on floodways and on controlling flood elevations is available.

Id. § 4012 (emphasis added). The statute also establishes that "[a]fter December 31, 1971, no new flood insurance coverage shall be provided under this chapter in

any area (or subdivision thereof) unless an appropriate public body shall have adopted adequate land use and control measures (with effective enforcement provisions) which [FEMA] finds are consistent with the comprehensive criteria for land management and use under section 4102 of this title." Id. § 4022(a).

Thus, FEMA is required to make flood insurance available in only those areas that have: (1) evidenced interest in securing flood insurance through the NFIP, and (2) adopted adequate land use and control measures that are consistent with the comprehensive criteria for land management and use developed by FEMA pursuant to 42 U.S.C. § 4102. Id. §§ 4012(c), 4022(a). In order to ascertain whether a locality interested in participating in the NFIP has adopted adequate land use and control measures, FEMA is authorized to conduct studies, Id. § 4102(a), and, on the basis of those studies and other relevant information, to develop the "comprehensive criteria" referenced above. Those criteria must be designed to encourage, where necessary, the adoption of state and local measures that will:

(1) constrict the development of land which is exposed to flood damage where appropriate,
(2) guide the development of proposed construction away from locations which are threatened by flood hazards,
(3) assist in reducing damage caused by floods, and
(4) otherwise improve the long-range land management and use of flood-prone areas.

Id. § 4102(c). The criteria now in effect are set forth in FEMA's regulations at 44

C.F.R. § 60.1–.26.  The criteria relevant here are discussed below.

In addition to guiding FEMA's issuance of flood insurance, the NFIA requires FEMA to implement a "community rating system program" that provides discounts on flood insurance premiums in communities that establish additional floodplain management regulations that exceed the minimum criteria set forth in FEMA's eligibility criteria.  42 U.S.C. § 4022(b).  Congress established the community rating system to serve four purposes:

> (A) to provide incentives for measures that reduce the risk of flood or erosion damage that exceed the criteria set forth in section 4102 of this title and evaluate such measures;
> (B) to encourage adoption of more effective measures that protect natural and beneficial floodplain functions;
> (C) to encourage floodplain and erosion management; and
> (D) to promote the reduction of Federal flood insurance losses.

Id. § 4022(b)(1).

### B. The Endangered Species Act

The Endangered Species Act of 1973 ("ESA") is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  Its stated purposes were "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C.

§ 1531(b).  "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."  Tenn. Valley Auth, 437 U.S. at 184.  In short, the preservation of endangered species was to be considered "the highest of priorities."  Id. at 194.  At the most basic level, this goal translated into the ESA's requirement that the Secretaries of Commerce and the Interior maintain a list of endangered and threatened species ("listed species") and designate their critical habitats.  16 U.S.C. § 1533.  The FWS administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior, and the National Marine Fisheries Service, not relevant here, administers the ESA with respect to those under the jurisdiction of the Secretary of Commerce.[2]  See Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. ----, 127 S. Ct. 2518, 2526 (2007); 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b).

At the heart of this dispute, and of Congress's plan to preserve endangered and threatened species, is section 7 of the ESA, which places affirmative obligations upon federal agencies.  Section 7(a)(1) provides that all federal agencies "shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species

---

[2] It is the FWS's administration of the ESA that is at issue in this case.

and threatened species." 16 U.S.C. § 1536(a)(1).

The mandate of section 7(a)(2) is even clearer:

Each Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical, unless such agency has been granted an exemption for such action . . . pursuant to subsection (h) of this section.

Id. § 1536(a)(2). Thus, Section 7(a)(2) imposes two obligations upon federal agencies. The first is procedural and requires that agencies consult with the FWS to determine the effects of their actions on endangered or threatened species and their critical habitat. Id. § 1536(b). The second is substantive and requires that agencies insure that their actions not jeopardize endangered or threatened species or their critical habitat. Id. § 1536(a)(2).

Regulations implementing the procedural consultation requirement provide for an optional, informal consultation between the acting agency and the FWS prior to a determination that formal consultation is required. 50 C.F.R. § 402.02, .13. Formal consultation "is a process between the [FWS] and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act." Id. § 402.02. It is required if an acting agency determines that any action it takes "may affect listed species or critical habitat."

7

Id. § 402.14(a). Following formal consultation, the FWS is required to issue the acting agency "a written statement setting forth the [FWS's] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02 (referring to the FWS's written statement as its "Biological opinion").

If the FWS finds "jeopardy or adverse modification" to a listed species or its critical habitat, "the [FWS] shall suggest those reasonable and prudent alternatives which [it] believes would not violate subsection (a)(2)." 16 U.S.C. § 1536(b)(3)(A). In response to an opinion finding "jeopardy or adverse modification," the acting agency must comply with the substantive mandate of section 7(a)(2) and either "terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)." Nat'l Ass'n of Home Builders, 127 S. Ct. at 2526.

Before discussing the interplay of the NFIA and the ESA in this case, we summarize the relevant facts of this lengthy proceeding.

## II. BACKGROUND OF THIS CASE

In 1984, the FWS determined that FEMA's administration of the NFIP in the

Florida Keys potentially jeopardized the existence of the Florida Key deer by effectively authorizing the development that pushed the Key deer to the brink of extinction. In 1989, however, FEMA refused the FWS's request for formal consultation, asserting that the ESA did not apply to the NFIP.

In 1990, the plaintiffs, which we hereafter collectively refer to as the "Wildlife Organizations," filed this suit seeking an injunction requiring FEMA to comply with section 7(a)(2) of the ESA by formally consulting with the FWS about the impact of its administration of the NFIP on the Key deer. The Wildlife Organizations adopted the FWS's argument that the NFIP encouraged new development that threatened the meager population of 250–300 Key deer with extinction. Fla. Key Deer v. Stickney (Fla. Key Deer I), 864 F. Supp. 1222, 1230–31 (S.D. Fla. 1994). After a bench trial, the district court agreed and entered a Memorandum Opinion and Final Declaratory Judgment in the Wildlife Organizations' favor, requiring FEMA to consult with the FWS. Id. at 1240–42. The court retained jurisdiction over the case to enforce the injunctive relief granted. Id. at 1242. FEMA did not appeal that ruling.

In compliance with this 1994 ruling, FEMA consulted with the FWS regarding the impact of the NFIP on the Key deer and nine other endangered or threatened species. In 1997, the FWS issued its opinion, which found, among

other things, that the NFIP, as administered in the Florida Keys, jeopardized the continued existence of the Key deer and eight other listed species. In accordance with its regulations and the ESA, the FWS recommended "reasonable and prudent alternatives" ("1997 RPAs") to the manner in which FEMA administered the NFIP to avoid placing the Key deer and other listed species in jeopardy. The 1997 RPAs provided for review by the FWS of new development within the suitable habitat of the listed species. In compliance, Monroe County conditioned the grant of building permits to landowners on the completion of FWS review. During that review, the FWS was to determine whether the proposed project "may" or "would not" adversely affect endangered or threatened species or designated critical habitat. Depending upon the answer, the FWS would take appropriate action to ensure compliance with the ESA. In the 1997 RPAs, the FWS also recommended that FEMA evaluate Monroe County's compliance with the consultation procedure, notify the County of violations, and treat violations as substantive deficiencies pursuant to 44 C.F.R. § 60.3–.5. The County's failure to correct the deficiencies would result in probation or suspension of its participation in the NFIP.

Finally, the 1997 RPAs also included "conservation recommendations" under section 7(a)(1) of the ESA. Specifically, the FWS recommended that FEMA provide incentives in the form of reduced insurance premiums for completion of a

10

comprehensive, county-wide habitat conservation plan. FEMA adopted the 1997 RPAs and conservation recommendations in 1997.

In 1998, the Wildlife Organizations filed an amended complaint in the original lawsuit, adding the FWS as a defendant and challenging the adequacy of the 1997 RPAs and the accompanying conservation recommendations under the ESA and the Administrative Procedure Act. The Wildlife Organizations claimed that the 1997 RPAs failed to "insure that [the NFIP would not] jeopardize the continued existence of any endangered species or threatened species" or their critical habitat pursuant to 16 U.S.C. § 1536(a)(2); that FEMA was not adhering to the FWS review suggested in the 1997 RPAs; and that the conservation program adopted by FEMA did not satisfy section 7(a)(1).

Before the district court ruled on cross-motions for summary judgment, FEMA and the FWS reinitiated consultation. The new consultation apparently arose from a provision of the 1997 RPAs that required a second consultation if Monroe County failed to complete a habitat conservation plan within four years, which in fact the County failed to do. In 2003, the FWS issued a second opinion assessing the threat that FEMA's administration of the NFIP posed to the listed species in the Florida Keys. It concluded that the NFIP jeopardized eight of the ten species considered in 1997, but that the 1997 RPAs adequately protected the listed

11

species. Accordingly, it simply reiterated its recommendation that FEMA continue to implement the same "reasonable and prudent alternatives" ("2003 RPAs") suggested in 1997 and the same conservation recommendations made in 1997 pursuant to section 7(a)(1), even though the challenges to the 1997 RPAs contained in the first amended complaint had not been resolved. The Wildlife Organizations correspondingly amended their complaint in order to challenge the 2003 RPAs, the conservation recommendations, and FEMA's decision to adopt them.

On March 29, 2005, the district court granted the Wildlife Organizations' motion for summary judgment, finding that FEMA had not satisfied its obligation under section 7(a)(1) to carry out programs to conserve species and that neither FEMA nor the FWS had satisfied their obligations under section 7(a)(2). Fla. Key Deer v. Brown (Fla. Key Deer II), 364 F. Supp. 2d 1345, 1352–61 (S.D. Fla. 2005). On September 12, 2005, the district court enjoined FEMA from providing any insurance for new developments in the suitable habitat of the listed species in Monroe County pending further consultation and compliance with its order of March 29, 2005. Fla. Key Deer v. Brown (Fla. Key Deer III), 386 F. Supp. 2d 1281, 1294 (S.D. Fla. 2005).[3]

_____

[3] After the briefing in this appeal was submitted, FEMA and the FWS concluded the third consultation as ordered by the district court. The FWS issued its third opinion on the effects of the NFIP on endangered or threatened species in the Florida Keys on August 8, 2006, along with proposed "reasonable and prudent alternatives" ("2006 RPAs"). FEMA adopted the 2006 RPAs

## III. DISCUSSION

FEMA and the FWS challenge the district court's grant of summary judgment and injunctive relief, arguing that:

> (1) section 7(a)(2) of the ESA does not apply to FEMA's administration of the NFIP;
> (2) section 7(a)(2) of the ESA does not require FEMA to perform an independent analysis of the FWS's proposed "reasonable and prudent alternatives" before adopting them;
> (3) section 7(a)(1) of the ESA does not require agencies to develop species- and location-specific programs for the conservation of listed species; and
> (4) the district court exceeded its authority by issuing an injunction that is allegedly inconsistent with the ESA and the NFIA.

We address each argument in turn.[4]

### A. Whether section 7(a)(2) of the ESA applies to FEMA's administration of the NFIP

A regulation promulgated jointly by the Secretaries of Commerce and the Interior provides that section 7 applies "to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. During the pendency of this appeal, the Supreme Court had the opportunity to rule upon the validity of that regulation. It upheld the regulation as reasonable and affirmed that

on the very same date of their issuance. The results of this most recent consultation are not relevant to this appeal.

[4] With the exception of their challenge to the district court's finding that FEMA must perform an independent analysis of proposed "reasonable and prudent alternatives," FEMA and the FWS do not appeal from the district court's determination that their actions with respect to the 2003 RPAs and biological opinion were arbitrary and capricious.

13

section 7(a)(2) "covers only discretionary agency actions and does not attach to actions . . . that an agency is required by statute to undertake once certain specified triggering events have occurred." Nat'l Ass'n of Home Builders, 127 S. Ct. at 2536. Therefore, the primary issue for us to consider regarding section 7(a)(2) of the ESA is whether FEMA has any discretion in its administration of the NFIP such that it is bound by the requirements of section 7(a)(2). FEMA and the FWS argue that this case is similar to National Association of Home Builders and that FEMA does not have the required discretion under the NFIA. We disagree.

The Supreme Court defined the requisite discretion for section 7(a)(2) of the ESA as the discretion "to consider the protection of threatened or endangered species as an end in itself." Id. at 2537. This does not, as the parties conceded at oral argument, require the statute at issue to use environmental terminology for agency discretion to be found: there is no environmental-words test. See, e.g., In re Operation of Mo. River Sys. Litig., 421 F.3d 618 (8th Cir. 2005) (finding sufficient agency discretion in administration of the Flood Control Act of 1994, which required the consideration of flood control and navigation, primarily, in agency's construction of a dam and reservoir system). Accordingly, we ask whether FEMA has discretion in administering the NFIP to consider the protection of endangered or threatened species as an end.

14

In operating the NFIP, FEMA is required to make flood insurance available in those areas with adequate land use and control measures, as judged by comprehensive eligibility criteria developed by FEMA. 42 U.S.C. § 4012(c). FEMA develops the eligibility criteria pursuant to the authority conferred by 42 U.S.C. § 4102(c). That provision requires FEMA to consider "studies and investigations, and such other information as [it] deems necessary" to "develop comprehensive criteria designed to encourage, where necessary, the adoption of adequate State and local measures which, to the maximum extent feasible, will," in addition to reducing the development of flood-prone land, "otherwise improve the long-range land management and use of flood-prone areas." Id. (emphasis added). This statutory scheme bears little resemblance to the scheme in National Association of Home Builders, where no discretion was found.

In National Association of Home Builders, the Supreme Court considered the interplay between the seemingly conflicting mandates of the Clean Water Act ("CWA") and the ESA. The CWA established the National Pollution Discharge Elimination System ("NPDES"), which is "designed to prevent harmful discharges into the Nation's waters." Nat'l Ass'n of Home Builders, 127 S. Ct. at 2525. Although the Environmental Protection Agency ("EPA") initially administers the NPDES permitting system for each state, it must transfer that permitting authority

15

to a state upon application and satisfaction of nine statutory criteria. Id. Those criteria test the authority under state law of the would-be administering agency to carry out the NPDES program. Id. at 2525 & n.2. The respondents before the Court argued that the EPA has discretion to consider listed species in making an NPDES transfer decision. Id. at 2537. The Court rejected the argument, stating that "[n]othing in the text of [the CWA's operative provision] authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application." Id. Additionally, the Court noted that "to the extent that some of the [CWA] criteria may result in environmental benefits to marine species, there is no dispute that [the state at issue] has satisfied each of those statutory criteria." Id. In other words, although the CWA "requires the EPA to consider whether [a state] has the legal authority to enforce applicable water quality standards, . . . the permit transfer process does not itself require scrutiny of the underlying standards or of their effect on marine or wildlife." Id. at 2537 n.10.

Here, by contrast, Congress set out several purposes for FEMA to consider in FEMA's development of the criteria relevant to its assessment of whether a requesting locality has adequate land use and control measures in place. 42 U.S.C. § 4102(c). Moreover, those purposes are broad and contemplate restriction of land development and consideration of whether a locality's land-use measures will

16

"otherwise improve" land management and use. Therefore, although FEMA is required to issue flood insurance to localities that satisfy certain criteria, FEMA itself is charged with developing those criteria and enjoys broad discretion in so doing. See Nat'l Wildlife Fed'n v. FEMA, 345 F. Supp. 2d 1151, 1173–74 (W.D. Wash. 2004) (finding that FEMA has discretion in its development of the eligibility criteria).

FEMA also enjoys broad discretion in its implementation of the community rating system program pursuant to 42 U.S.C. § 4022(b). See id. at 1174 (finding that FEMA has discretion in designing the community rating system program). Congress directed FEMA to design the program and, in its discretion, to reward localities with discounted insurance premiums for the adoption of floodplain management regulations that exceed the minimum criteria discussed above. 42 U.S.C. § 4022(b). Among the purposes Congress directed FEMA to consider in designing the program is the protection of "natural and beneficial floodplain functions." Id. § 4022(b)(1)(B). We find that the language of 42 U.S.C. § 4022(b)(1) provides ample discretion for FEMA to consider listed species.

Based upon our review of the NFIA's scheme for the development of eligibility criteria and of the purposes served by the community rating system program, we are satisfied that FEMA has discretion to consider endangered and

threatened species in its administration of the NFIP. Indeed, this finding is consistent with FEMA's own regulations implementing the NFIP, wherein wildlife and environmental concerns are considered. See 44 C.F.R. § 60.5(b)(2) (imposing the condition that certain communities "[r]equire a setback for all new development from the ocean, lake, bay, riverfront or other body of water, . . . designated by the Administrator according to the flood-related erosion hazard and erosion rate, . . . and depending upon the geologic, hydrologic, topographic and climatic characteristics of the community's land," and explaining that "[t]he buffer may be used for . . . wildlife habitat areas"); id. § 60.6(b)(1) (requiring that communities seeking an exception from the obligation to adopt adequate flood plain regulations "shall explain in writing to [FEMA] the nature and extent of and the reasons for the exception request and shall include sufficient supporting economic, environmental, topographic, hydrologic, and other scientific and technical data, and data with respect to the impact on public safety and the environment"); id. § 60.22(c)(2) (requiring that communities, in adopting floodplain regulations, consider "[d]iversion of development to areas safe from flooding . . . in light of the need to prevent environmentally incompatible flood plain use"); id. § 60.25(b)(9) (requiring that participating States maintain the ability to "[e]stablish minimum State flood plain management regulatory standards

18

consistent . . . with other Federal and State environmental and water pollution standards for the prevention of pollution during periods of flooding").

FEMA and the FWS alternatively argue that even if FEMA has the requisite discretion to consider the effects of its administration of the NFIP on listed species, the issuance of flood insurance is not a legally relevant "cause" of the development in the Florida Keys that threatens the listed species. We are not persuaded.

By its terms, section 7(a)(2) of the ESA applies to "any action authorized, funded, or carried out by" the agency at issue. 16 U.S.C. § 1536(a)(2); see also 50 C.F.R. § 402.02 (providing examples of agency "action"). The applicable regulations direct agencies, in considering whether formal consultation is required, "to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). A later portion of the same regulation confirms that agencies must consider the "effects of the action as a whole." Id. § 402.14(c). The "[e]ffects of the action" include the "direct and indirect effects of an action on the species or critical habitat," and "[i]ndirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." Id. § 402.02.

This statutory and regulatory framework for determining when an agency action requires section 7(a)(2) consultation is materially indistinguishable from the

19

framework of the National Environmental Policy Act ("NEPA") considered by the Supreme Court in Department of Transportation v. Public Citizen, 541 U.S. 752 (2004). The issue in Public Citizen was whether NEPA and the Clean Air Act required the Federal Motor Carrier Safety Administration ("FMCSA") to evaluate "the environmental effects of cross-border operations of Mexican-domiciled motor carriers." Id. at 756. The FMCSA was charged with promulgating safety and financial regulations for motor carriers and with granting registrations to motor carriers willing and able to comply with those regulations. Id. at 758–59. It had "no statutory authority to impose or enforce emissions controls or to establish environmental requirements unrelated to motor carrier safety." Id. at 759. After reviewing NEPA's framework, the Court determined that the environmental effects of cross-border operations could not be considered effects of the FMCSA's issuance of regulations and registrations because the FMCSA "simply lacks the power to act" on the environmental consequences of what Congress required it to do. Id. at 768. The Court summarized its holding: "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." Id. at 770.

Although the statutory frameworks considered here and in Public Citizen are

quite similar, the facts of the cases are not. Here, FEMA has the authority in its administration of the NFIP, as discussed above, to prevent the indirect effects of its issuance of flood insurance by, for example, tailoring the eligibility criteria that it develops to prevent jeopardy to listed species. Therefore, its administration of the NFIP is a relevant cause of jeopardy to the listed species. This is confirmed by the FWS's own interpretation that section 7 applies to the NFIP and its findings made during formal consultation with FEMA that the NFIP jeopardizes listed species because development is encouraged and in effect authorized by FEMA's issuance of flood insurance. See Fla. Key Deer I, 864 F. Supp. at 1232, 1236. Public Citizen does not mandate a different result because it stands for nothing more than the intuitive proposition that an agency cannot be held accountable for the effects of actions it has no discretion not to take. Critical to the result in Public Citizen was the fact that the FMCSA had "no ability to countermand the President's lifting of the moratorium [on qualified Mexican motor carriers] or otherwise categorically to exclude Mexican motor carriers from operating within the United States." 541 U.S. at 766.

Having determined that section 7(a)(2) applies to FEMA's administration of the NFIP, we discuss whether the ESA requires FEMA to independently analyze the FWS's proposed "reasonable and prudent alternatives" prior to adopting them.

21

### B. Whether section 7(a)(2) of the ESA requires FEMA to independently analyze the FWS's proposed "reasonable and prudent alternatives"

In addition to finding that the FWS's 2003 RPAs were arbitrary and capricious, the district court held that "FEMA's admitted failure to engage in any independent consideration of the sufficiency of the 2003 RPAs renders its actions arbitrary and capricious." Fla. Key Deer II, 364 F. Supp. 2d at 1359. That is, the district court found that agencies cannot rely exclusively on the FWS's post-consultation recommendations without conducting any independent analysis of their sufficiency. For this proposition, the court relied upon Pyramid Lake Paiute Tribe of Indians v. U.S. Department of the Navy, wherein the Ninth Circuit stated that "[a] federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a[n] FWS biological opinion must not have been arbitrary or capricious." 898 F.2d 1410, 1415 (9th Cir. 1990). The Ninth Circuit qualified its statement, however, stating that "another agency's reliance on that opinion will satisfy its obligations under the [ESA] if a challenging party can point to no 'new' information—i.e., information the [FWS] did not take into account—which challenges the opinion's conclusions." Id.

We agree with the Ninth Circuit and do not share the concern of the Wildlife Organizations that an agency will be able to avoid substantive review of its

22

adopted "reasonable and prudent alternatives" merely by pointing to its reliance on the FWS's opinion. If the FWS's proposed "reasonable and prudent alternatives" are arbitrary and capricious, an agency's decision to adopt them is likewise arbitrary and capricious and may be challenged.[5] FEMA need not, therefore, conduct any independent analysis of the proposed alternatives; however, as the Ninth Circuit notes, where new information arises between the proposal and the adoption, and an acting agency would otherwise be required to consider that information prior to acting, the decision to adopt is particularly susceptible to challenge absent consideration of the new evidence. Id. Perhaps in acknowledgment of this possibility, FEMA adopted the 2006 RPAs the same day that the FWS proposed them.[6]

### C. Whether section 7(a)(1) of the ESA requires agencies to develop species- and location-specific conservation programs

Section 7(a)(1) of the ESA imposes a separate obligation upon federal agencies and, in relevant part, states that all federal agencies "shall," in consultation with the FWS or National Marine Fisheries Service, "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs

---

[5] FEMA and the FWS appear to concede as much in their briefing and at oral argument.

[6] FEMA adopted the 2006 RPAs during the pendency of this appeal, and the Wildlife Organizations have not, as of yet, challenged their sufficiency.

for the conservation of [listed species]." 16 U.S.C. § 1536(a)(1). The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." Id. § 1532(3). In an attempt to comply with section 7(a)(1), FEMA modified its community rating system program in 1999 pursuant to the FWS's recommendation to provide communities with credits and reduced insurance rates for adopting a habitat conservation plan, and to provide additional credits and reduced rates for adopting an FWS-approved habitat conservation plan. The program is nationally available, but Monroe County is currently not eligible because it has not complied with the program's requirements.[7] The record establishes that some communities that adopted conservation plans prior to FEMA's implementation of the modified community rating system program applied for credit for those plans but is silent as to whether the communities actually received credit. Additionally, no evidence cited indicates that any community in the nation has, since the inception of the program, applied for or received credit for a habitat conservation plan.

---

[7] The Wildlife Organizations note that FEMA also appointed a staff member to attend inter-agency meetings concerning a multi-species recovery program in southern Florida but that the program has taken no conservation action. On appeal, FEMA defends its compliance with section 7(a)(1) entirely on the basis of the modified community rating system program. We therefore do not consider the apparently unrelated staff-member appointment in our discussion of section 7(a)(1).

After determining that section 7(a)(1) imposes a "specific, rather than a generalized duty to conserve species," the district court held that FEMA failed to fulfill its obligations under the provision because FEMA had implemented only a voluntary program with no effect on the specific species affected by its actions. Fla. Key Deer II, 364 F. Supp. 2d at 1361. It determined that FEMA's reading of section 7(a)(1) was inconsistent with its plain meaning and intent. Id. On appeal, FEMA and the FWS argue that section 7(a)(1) does not require species- or location-specific programs and that it confers significant discretion upon acting agencies in their selection of conservation programs. The question here, then, is whether the modified community rating system program adopted by FEMA satisfies its obligation under section 7(a)(1).

A number of courts addressing section 7(a)(1) have stated that it imposes only a general requirement, the specifics of which are subject to the discretionary authority of each federal agency. See Pyramid Lake, 898 F.2d at 1418 ("We have recognized that the Secretary is to be afforded some discretion in ascertaining how best to fulfill the mandate to conserve under section 7(a)(1)."); Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 135 (D.D.C. 2001) (agencies have discretion in choosing how to comply with section 7(a)(1)); Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency, 268 F. Supp. 2d 1255, 1273 (D. Or. 2003) ("The

25

statute does not mention species-specific programs. Rather, the agency may reasonably interpret its § 7(a)(1) obligations to extend no further than engaging in conservation programs that benefit threatened species. The court gives an agency substantial deference in interpreting its own statute."); see also Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005) ("An agency has a specific, not generalized, duty to conserve species. Section 7(a)(1) provides a mandatory duty to conserve, but the statute does not require particular conservation action.") (citation omitted).

The Fifth Circuit, however, has held that section 7(a)(1) imposes a specific obligation upon all federal agencies to carry out programs to conserve each endangered and threatened species. Sierra Club v. Glickman, 156 F.3d 606, 616 (5th Cir. 1998) ("Given the plain language of the statute and its legislative history, we conclude that Congress intended to impose an affirmative duty on each federal agency to conserve each of the species listed pursuant to [16 U.S.C.] § 1533. In order to achieve this objective, the agencies must consult with [the] FWS as to each of the listed species, not just undertake a generalized consultation.").

In this case, we need not address the scope of discretion afforded agencies under section 7(a)(1) or whether section 7(a)(1) imposes species- or location-specific obligations. Even assuming that FEMA has the discretion it claims,

26

section 7(a)(1) imposes a judicially reviewable obligation upon all agencies to carry out programs for the conservation of endangered and threatened species.  See 16 U.S.C. § 1536(a)(1) ("All other Federal agencies shall . . . utilize their authorities . . . by carrying out programs for the conservation of endangered species and threatened species . . . .") (emphasis added); Glickman, 156 F.3d at 616.  Total inaction is not allowed.  See, e.g., Glickman, 156 F.3d at 617–18; Nat'l Wildlife Fed'n, 332 F. Supp. 2d at 187 (section 7(a)(1) confers discretion, but that "discretion is not so broad as to excuse total inaction"); Defenders of Wildlife, 354 F. Supp. 2d at 1174 ("compliance is not committed to agency discretion by law").

The Ninth Circuit has given substance to the baseline requirement of section 7(a)(1) that federal agencies actually carry out conservation programs.  In Pyramid Lake, a case relied upon heavily by FEMA and the FWS, the plaintiff argued that section 7(a)(1) required the U.S. Department of the Navy to adopt the plaintiff's suggested conservation recommendation, which was the "least burdensome alternative" to the actual program implemented by the Navy.  898 F.2d at 1417. Writing for a panel of the Ninth Circuit, Judge O'Scannlain declined to require as much, in part because of the discretion afforded agencies in determining how to fulfill their obligations under section 7(a)(1).  Id. at 1418.  The court further noted that, even were it to adopt the plaintiff's stringent interpretation of section 7(a)(1),

27

the court would defer to the district court's finding of fact that the plaintiff's proposed alternative program "would have an insignificant effect." Id. at 1418 n.19. In Judge O'Scannlain's view, "[a]n 'insignificant' conservation measure in the context of [the] ESA is oxymoronic; if the proposed measure will be insignificant in its impact, how can it serve the ends of conservation, and thus be a 'conservation measure'?" Id. at 1418.

We agree with the standard articulated by Judge O'Scannlain in Pyramid Lake, that while agencies might have discretion in selecting a particular program to conserve—an issue we do not decide here—they must in fact carry out a program to conserve, and not an "insignificant" measure that does not, or is not reasonably likely to, conserve endangered or threatened species. To hold otherwise would turn the modest command of section 7(a)(1) into no command at all by allowing agencies to satisfy their obligations with what amounts to total inaction.

Here, we have no trouble concluding that FEMA's program to conserve amounted to the total inaction that other courts have condemned. Through the program, FEMA has offered incentives for communities to develop conservation plans for approximately nine years, and yet FEMA has cited no record evidence that even a single community has developed or adopted such a plan in response. The program has had no effect whatsoever despite its long tenure, and it is

28

therefore not a program to conserve.

### D. Whether the district court's injunction
### was inconsistent with the ESA and the NFIA

On the basis of its conclusion that FEMA failed to fulfill its obligations under section 7(a)(2) of the ESA, the district court enjoined FEMA from issuing flood insurance for new developments in the suitable habitats of the listed species in Monroe County. FEMA and the FWS challenge the injunction on appeal, claiming that the district court erred by requiring FEMA to act inconsistently with the NFIA. They argue that the NFIA commands FEMA to issue flood insurance to otherwise eligible communities and that FEMA is without discretion to selectively issue flood insurance in Monroe County. We find no error in the district court's injunction.

Where a federal agency fails to comply with the ESA, it is settled that a court may enjoin the agency from further noncompliant action pending satisfaction of the ESA's requirements. See Tenn. Valley Auth., 437 U.S. at 193–95; Wash. Toxics Coal. v. Envtl. Prot. Agency, 413 F.3d 1024, 1034 (9th Cir. 2005) ("It is well-settled that a court can enjoin agency action pending completion of section 7(a)(2) requirements."). Furthermore, the injunction at issue here does not require FEMA to act inconsistently with the command of the NFIA to issue flood insurance in otherwise eligible communities. The injunction prohibits the issuance

29

of flood insurance for new developments in the suitable habitats of the listed species, but it does not require FEMA to continue to issue flood insurance in Monroe County. FEMA may, consistently with the injunction and its discretion to consider the ESA in its development of eligibility criteria, withdraw Monroe County's eligibility for flood insurance pending the required consultation with the FWS and development of new and satisfactory eligibility criteria. In other words, nothing in the NFIA requires FEMA to issue flood insurance if the comprehensive criteria established under 42 U.S.C. § 4102(c) are not satisfied.

## IV. CONCLUSION

For the foregoing reasons, we **affirm** the judgment of the district court.